Garnet D. EVERROAD, Danny J.
Henning, Mark A. Smith, Nancy
Calender, Appellants,

v.

STATE of Indiana, Appellee.

No. 181S23.

Supreme Court of Indiana.

Dec. 14, 1982.

Rehearing Denied Feb. 1, 1983.

Colman & Loftman, Bloomington, for appellants.

Linley E. Pearson, Atty. Gen., Margarett L. Knight, Deputy Atty. Gen., Indianapolis, for appellee.

PIVARNIK, Justice.

Appellants were jointly tried and convicted in a jury trial in the Brown Circuit Court on July 18, 1980. The following convictions and sentences were handed down: Nancy Calender, Conspiracy to Deal in a Controlled Substance, Ind.Code § 35–41–5–2 (Burns Repl.1979) and Ind.Code § 35–48–4–2 (Burns Supp.1982), six (6) years and a fine of one dollar ($1.00); Possession of Cocaine, Ind.Code § 35–48–4–6 (Burns Supp.1982), two (2) years, sentences to run concurrently; Danny J. Henning, Conspiracy to Deal in a Controlled Substance, fourteen (14) years and a fine of five thousand ($5,000) dollars; Possession of Cocaine, five (5) years, sentences to run concurrently; Mark A. Smith, Conspiracy to Deal in a Controlled Substance, six (6) years; Possession of Cocaine, two (2) years, sentences to run concurrently; and Garnet D. Everroad, Conspiracy to Deal in a Controlled Substance, ten (10) years and a fine of five thousand ($5,000) dollars; Possession of Cocaine, five (5) years, sentences to run concurrently; and Possession of Methaqualone and Marijuana, Ind.Code § 35–48–4–6, (Burns Supp.1982) and Ind.Code § 35–48–4–11 (Burns Supp.1982), two (2) years, to be served consecutively to the previous sentences. Appellants now appeal.

Six issues are raised by Appellants, concerning:

1. whether the trial court erred in denying Appellants' motion for continuance made on July 2, 8, and 9, 1980;

2. whether the trial court erred in failing to find that Danny J. Henning was entrapped;

3. whether the trial court erred by admitting into evidence certain items since chain of custody has not been established;

4. whether the trial court erred in denying Appellants' motion to compel discovery;

5. whether there was sufficient evidence to convict Appellants; and

6. whether the trial court erred in overruling Appellants' motion to suppress evidence.

On February 13, 1980, members of the Indiana State Police and the Greenwood Police Department had undercover agents in the Narcotics Division in the Greenwood area. Members of the Greenwood Police Department contacted the Indiana State Police Department, indicating they needed some help in locating a possible two-hundred (200) pounds of marijuana. Detective Sergeant Douglas M. Sheets, of the Indiana State Police, was at that time working with Sergeant Roy Waddell, also of the Indiana State Police, in the Greenwood area. That same day, Sergeant Dyne, of the Greenwood Police, contacted an informant, Leo Smith, to purchase marijuana. Informant Smith contacted Dennis Allen Hestand, who later was charged as a co-conspirator in this cause and who entered a plea of guilty to conspiracy in dealing in a controlled substance, namely cocaine, a class B felony. Hestand did not know anyone else was involved when first contacted by informant Leo Smith. As far as Hestand knew, the marijuana was for Leo. Hestand then called defendant Danny J. Henning at his home, thinking Henning might be able to help him. He thought he could trust Henning as he had known him since about the fourth grade and Hestand and Henning had gotten "high" together on marijuana and "coke" in the past. Henning told Hestand that he could not furnish marijuana but after two or three telephone conversations with Hestand, Henning told Hestand he could furnish cocaine. Leo Smith and Officer Sheets then met Hestand at Green Acres Tavern in Greenwood, Indiana, at approximately 4:30 p.m. on February 13, 1980. Officer Sheets mentioned a kilo of cocaine and Hestand said he could do more than a kilo if Sheets had the money. Apparently Hestand had been told by Henning that more than a kilo was available. Officer Sheets had been advised by Hestand that he had contacted his source for cocaine and his source would meet them at Green Acres Tavern at 7:00 p.m. Sheets and Hestand did meet Danny J. Henning at Green Acres Tavern in Greenwood at 7:00 p.m. on that day, February 13, 1980. Henning arrived at 7:10 p.m., carrying a plastic sand-

wich bag containing a white powder which he produced when Officer Sheets asked him if he had the "tester." The bag contained an ounce of white powder. Officer Sheets tested the powder and found it was cocaine. Henning then took back the bag of cocaine. Henning stated he could not "do" a kilo but he could "do" a pound. The only previous discussion as to how much would be delivered was the statement by Hestand to Sheets that he could get more than a kilo if he had the money. After discussing the money and setting a price at $28,000, a deal was made at the Green Acres Tavern.

Sheets and Henning then agreed to meet at Sambo's restaurant in Franklin, Indiana, at 10:00 that night. Henning wanted Hestand to be present also. Sheets was not advised as to where Henning was going to get the pound of cocaine. Henning arrived at Sambo's a little after 10:00 p.m., drove around the parking area and left. About ten minutes after 10:00, he came back, parked next to Sheets in Sambo's parking lot and told Sheets there was a State policeman parked on the north side of the restaurant. Sheets got into the car Henning was driving. Henning said he did not have the "coke" with him but asked Sheets to follow him and they would take care of it. Henning said he had to go to his partner's house to get it and that Sheets could stay out on the street. Sheets agreed to this. Henning mentioned State Road 135. Sheets then followed Henning down some back roads to the town of Spearsville, where Henning stopped at a phone booth and made a phone call. This was about 11:10 p.m. When he came back he told Sheets they had the package and were ready to deliver. Sheets then followed Henning to a residence on Greasy Creek Road in Nashville, Indiana. Henning pulled into the drive at the residence and Sheets pulled in behind him and backed up to where he could look at the house. When he backed up, Sheets was looking straight at the house, at a back porch and what was later found to be the living room. Henning said he had to go to the house to get the package. Henning was wearing a light colored pullover shirt, Levis, and no coat. He walked to the back door of the house and was handed something by a tall individual. The person was of medium build and was not comparable to Everroad. Sheets said it could not have been Everroad. The person was comparable to Mark Smith, who was 6'7" tall.

When Henning came from the house he showed Sheets a plastic bag which contained white powder. Henning was within Sheets' sight at all times during this transaction. When Henning went up the hill he was not carrying anything and when he came to the car he was carrying the sack containing the white powder. They started to make the exchange for the money when, according to Sheets, Henning seemed to be "breaking" with both the package and the money. Sheets then identified himself as a State Police Officer and got the package which was introduced at trial as State's Exhibit I. It was later determined to contain cocaine. Henning grabbed the money and ran. Sheets started to get out of the car when he heard a gun shot and saw a flash from the house. Sheets determined someone was firing shots at him. This was between 11:00 and 11:30 p.m. Sheets then fired a shot toward Henning who was fleeing the scene on foot with the money. He also fired a shot toward the house. One of the surveillance units was down the road about a thousand yards away and two officers came to the scene. Sheets radioed police units and other police came to the scene. Police officers yelled at the residents in the house to surrender but received no response. The police then identified themselves over a p.a. system, advising the people in the house that they were police and advising them to come outside and throw out any weapons they had before coming out. No one came out at that time. The police then laid down covering fire and moved to surround the house. Again the police called for persons to come out but there was no response. Appellant Everroad came out on the porch but went back into the house. A minute later Appellant Mark Smith came out and was placed under arrest. Smith called for Everroad to come out and about three minutes later, Ever-

road came out of the door and was placed under arrest. Nancy Calender then came out and was also placed under arrest. It had been approximately twenty to thirty minutes from the time the police arrived until Smith first came from the house. Several police officers then entered the house to look for any other possible occupants. The police searched the house, including closets, for other occupants, but did not open drawers or search for controlled substances. The only occupants of the house were Appellants Everroad, Mark Smith and Nancy Calender. No one else was seen on the premises. When the police entered the residence, the family room was full of smoke from a stove in which there was smoldering material which appeared to be burned paper. There were five plastic bags containing white powder on the kitchen counter, there was a plastic bag on the family room floor and one on the kitchen floor, both containing white powder. A search warrant was obtained and other plastic bags about the home were found to contain a residue of cocaine. The facts also tended to show that this residence was the home of, and under the custody and control of appellant Everroad. He was the only person who lived there full time, but Nancy Calender had been his girl friend for approximately two years and he saw her two or three times a week. Along with Nancy, Everroad's sister and mother did all of his errands, all of his bill-paying, and took care of his clothing, cleaning, food and so on. "Baggies" and zip-lock freezer bags found in the house were purchased by the three women. The telephone at the Everroad residence was in the name of Nancy Calender and she owned a 1971 Chevrolet Monte Carlo found on the premises. A search warrant for her automobile, which was on the premises at the time, revealed between three and four pounds of marijuana in the trunk of the automobile. Smith did not live on the premises although he had visited there several times, including the previous night. Smith and Everroad had known each other for approximately three years.

## I

Appellants contend the trial court committed reversible error by denying the motions for continuance made on July 2, 8, and 9, 1980. These motions were not based upon statutory grounds and therefore fall within the sound discretion of the trial court. *Vaughn v. State,* (1978) 269 Ind. 142, 378 N.E.2d 859; *Works v. State,* (1977) 266 Ind. 250, 362 N.E.2d 144. We will find reversible error only where there has been some clear abuse of discretion. Abuse is shown only where the record shows that the appellant was prejudiced. *Harris v. State,* (1981) Ind., 427 N.E.2d 658; *Whitacre v. State,* (1980) Ind., 412 N.E.2d 1202.

On May 5, 1980, a firm trial date of July 8, 1980, was set by the trial court. The record shows that informations in this cause were filed on February 14, 1980, and on February 21, defense counsel, David J. Colman, entered appearances for the four appellants in this appeal and the co-defendant, Dennis Allen Hestand. On March 12, 1980, Hestand requested the court to appoint a public defender for him and on March 25, 1980, James Miller entered his appearance for Hestand. The record further shows that arraignment was held on March 3, 1980, and on that date the State requested the cause be set for omnibus hearing within thirty days. Defense counsel then orally requested a thirty-day extension of time because co-counsel was absent from the county. The trial court granted his thirty-day extension and set the omnibus hearing for May 5, 1980. On June 3, 1980, defense counsel was granted a continuance to June 20, 1980, for a hearing based on the fact that defense counsel had a jury trial in Harrison County. On June 9, 1980, defense counsel again filed a verified motion for continuance alleging a conflicting final hearing in a divorce case. The trial court denied this motion. Hearings were resumed on June 20, and, due to the absence of a police officer, continued to June 27, 1980.

One of the grounds for the July 2 motion for continuance by the appellants was that numerous discovery items requested by the

appellants had not been made available to them. The record shows that on March 6, 1980, the appellants had filed a Notice of Request for Discovery. On June 10, 1980, the State filed with the trial court its notice of discovery compliance, alleging it had responded to the request for discovery, noting it had furnished the original notes of the Indiana State Police laboratory technician who prepared the report of laboratory examination and that the State had completed its response to the request for discovery. The motion for continuance of July 2, acknowledged receipt of requested laboratory testing material and that this material had been forwarded to a Dr. Robert Shapiro, at the University of Colorado, for his evaluation but Dr. Shapiro had not had sufficient time to provide the requested evaluation. As the State points out, Appellants did not show when the material was forwarded to Dr. Shapiro or that any attempt was made to have the materials evaluated locally. The State responded to the July 2 motion for continuance, alleging it had provided counsel with all discoverable items which it had in its possession, including a complete case report by Indiana State Police Officer Douglas Sheets, report of laboratory examination by the Indiana State Police Laboratory, all raw data providing the basis for the laboratory technician's conclusions and the full text of the statement by Danny J. Henning. It also alleged that the laboratory testing materials referred to in the Motion for Continuance had been in the possession of defense counsel for three weeks which was sufficient time for independent investigation. One other problem was that the State had not provided the appellants with a list of witnesses *per se* but indicated that through the police reports or personal knowledge, Appellants were aware of all the witnesses the State might call, and their whereabouts, since all of the witnesses were police officers involved in the cause with the exception of Linda Bauer and co-defendant Hestand.

The purpose of calling Linda Bauer was to put into evidence a lease showing that appellant Everroad leased the house in which the contraband was found. The State did not yet have the lease but had indicated to the defense when they obtained it they would immediately furnish a copy to the defense, which was done prior to trial. There was no denial, however, that Everroad was the person in control of the premises described in the lease and that he resided there. Everroad testified himself that he resided there and was the lessee of the premises and all of the appellants referred to the property as the Everroad house.

The record further shows that on July 7, 1980, Dennis Hestand withdrew his plea of not guilty and entered a plea of guilty. As part of the plea agreement, Hestand agreed to testify for the State. At noon on July 7, 1980, the prosecuting attorney notified defense counsel that Hestand had entered into a plea agreement, that he was going to plead guilty, and that he was going to testify against Henning. The trial court ordered depositions to be set up for 5:30 p.m. on July 8, 1980, for witnesses Wayne Brahaum, Linda Bauer, Officer Dyne, and Hestand. Defense counsel took the depositions of all of these persons except Hestand. Defense counsel stated they did not want to take Hestand's deposition and declined it at that time. The prosecuting attorney then indicated that he would be calling Hestand to the stand the next day and stated to defense counsel at the taking of the depositions: "[N]ow you're not going to turn around tomorrow when we call Hestand to the witness stand and object to him for the reason that you haven't taken his deposition?" Defense counsel stated they would affirm to the court on July 9, 1980, that Hestand had been there and was available for deposition. Counsel did object to the testimony of Hestand, however, because he was not on the witness list. These were the subjects of the appellants' motions for continuance on July 8 and 9. The trial court indicated to counsel that he would not permit any further delays in the trial, that ample time had been given for the presenting of all issues and for all discovery and that motions for continuance were denied. Defense counsel were then given an opportunity to question Hestand before he took the stand on July 9, 1980.

The trial court pointed out that trial setting was made on May 5, 1980, to begin on July 8, 1980. The appellants had had three separate hearings on various matters, starting May 22, again on May 29, and on June 20. On July 8, 1980, the State attempted to file an additional charge against Henning and the court refused the filing on the grounds that it would be cause for continuance. We do not find that the trial court abused its discretion because the appellants were not prejudiced by denial of the requested continuances. Appellants were given an opportunity to examine all witnesses on many occasions, including arrangements made during the trial. Garnet Everroad testified that the premises were his residence and that he had custody and control of it. Other witnesses testified that he lived there and all defense language referred to it as "the Everroad house." Several days prior to trial, defense counsel was informed that the State intended to introduce a copy of the lease as an exhibit and that they would furnish the appellants a copy of it as soon as it was received. It was furnished to the appellants prior to trial. This was not information privy to the State only. Everroad would have had a copy of it since he was the lessee. Co-conspirator Hestand was at all times a potential witness as the State contends. When he changed his plea and agreed to be called as a State's witness, this information was immediately given to the appellants and they were given an opportunity to depose him before his testimony. Defense declined this deposition. Prior to his testimony, however, the defense was given an opportunity to examine him and did so. There is no showing that the State withheld discovery information intentionally. It did comply with discovery requests and cooperated with the court and defense counsel in disclosing information at the earliest opportunity. There was no showing that defense was disabled because of a lack of discovery information. Appellants were not prejudiced by denial of the continuances of July 2, 8, 9, and the court did not abuse its discretion in denying such continuances.

## II

Appellant Henning contends that the trial court erred in entering a verdict which was contrary to the evidence showing that Henning was entrapped. His argument is that the State failed to introduce evidence to show that he had a predisposition to commit the crime of which he was convicted.

Ind.Code § 35–41–3–9 (Burns Repl.1979) reads as follows:

"*Entrapment.*—(a) It is a defense that:

(1) The prohibited conduct of the person was the product of a law-enforcement officer, or his agent, using persuasion or other means likely to cause the person to engage in the conduct; and

(2) The person was not predisposed to commit the offense.

(b) Conduct merely affording a person an opportunity to commit the offense does not constitute entrapment."

 When the defense of entrapment has been raised, the successful prosecution of the case depends upon whether the State can prove that the criminal conduct of the accused was not the product of the efforts of the law enforcement agent *or* that the accused was predisposed to engage in such conduct anyway. *Williams v. State,* (1980) Ind., 412 N.E.2d 1211; *Hardin v. State,* (1976) 265 Ind. 635, 358 N.E.2d 134. On appeal, we will resolve the issues using the same standard that we apply to other challenges to the sufficiency of the evidence. This Court will look only to the evidence most favorable to the State and all reasonable inferences to be drawn therefrom. We will not weigh conflicting evidence nor will we judge the credibility of the witnesses. We will not disturb a judgment that is supported by substantive evidence of probative value. *Marts v. State,* (1982) Ind., 432 N.E.2d 18; *Williams v. State,* (1980) Ind., 409 N.E.2d 571.

In *Thompson v. State,* (1972) 259 Ind. 587, 590, 290 N.E.2d 724, 726, *cert. denied,* 412 U.S. 943, 93 S.Ct. 2788, 37 L.Ed.2d 404, this Court adopted the reasoning of three federal cases:

"Where a third party, who does not know the true identity of the Government agent, unwittingly leads the Government agent to the defendant, there is no entrapment because it is the third party who induces the initial violation, not the Government agent. Therefore, the Government is not 'the initiator of the defendant's illegal acts in the sense of having induced the defendant to do what the defendant would otherwise not have been willing to do.' (citations omitted).

*United States v. DeLoache* (W.D.Mo. 1969), 304 F.Supp. 183; *See also United States v. Fox* (7th Cir.1971), 437 F.2d 733 and *United States v. Romano* (2d Cir. 1960), 278 F.2d 202."

The evidence, as we have already recounted it, shows that Henning was a third party stranger to the dealings the police officers had with informant Leo Smith in an attempt to find some two-hundred pounds of marijuana. Smith, as a police informant, contacted Hestand, who in turn contacted Henning. Appellant Henning makes much of the fact that he had to be asked four or five times to supply cocaine before he finally agreed to do so. He argues that this indicates the police had focused upon him as a suspect and therefore he was no longer a stranger to the dealings. The record shows, however, that Hestand was asked to get the cocaine by Smith. There was no indication that Sheets, the officer involved, spoke with Hestand until they met later or that Sheets, through Smith, kept on pressuring Hestand and eventually Henning, to comply with the request. Hestand said he did not know Sheets was a police officer or that anyone else was involved in the transaction until later on that day. Thus, Hestand, the third party, led the police to Henning.

■ Assuming, *arguendo,* that the police were the initiators of appellant Henning's illegal acts, the record reveals enough evidence to show that Henning was predisposed to sell cocaine. Hestand, after talking with Henning, told Smith and Sheets that they could have any amount of cocaine if they had the money. When Henning showed up at the Green Acres Tavern, Sheets asked for the "tester," a bag carrying a small amount of the substance which enables the purchaser to make sure he is receiving the narcotic drugs he desires. Even though Sheets said he did not know if "tester" was the proper street term, Henning apparently understood the drug terminology and produced the bag. Afterward, Henning said he had to go to his "partner's" for the cocaine. Henning was also able to obtain a substantial amount (one pound) of cocaine within a few hours after being asked to do so. When Sheets and Henning met later in a Sambo's parking lot, the presence of a police car, although it made Henning nervous, did not deter him from completing the transaction. Henning also argues that he did not offer to supply Sheets with cocaine in the future, showing that he was entrapped by the police into making an isolated sale. However, after obtaining the cocaine, Henning attempted to keep both the cocaine and the money. At this point, Sheets was forced to identify himself as a police officer, thereby making it unlikely that Henning would offer his future services. The above events were sufficient facts from which the jury could infer that Henning was predisposed to deal in controlled substances. *Stewart v. State,* (1979) Ind., 390 N.E.2d 1018. There was no error in entering the verdict against Henning.

### III

Appellants contend that the trial court erred in admitting into evidence the various numbered exhibits that composed the controlled substances upon which Appellants' convictions were based. The basis of the appellants' claim of error is that the State did not establish an unbroken chain of custody by the Indiana State Police officers. The State contends that inconsistencies in the testimony of the officers were minor and that there is no evidence that any of the items were not in the control and custody of the named Indiana State Police officers at all times or that the evidence had

been tampered with between February 15, 1980, when it was located at the trailer office headquarters of the Indiana State Police Narcotics Division until February 18, when it was turned over to the Indiana State Police chemist and analyst, Robert W. Read.

 The State properly contends that opposing evidence, discrepancies of witnesses and inference which connote conflicts are for the resolution of the jury. *Ingram v. State,* (1981) Ind., 421 N.E.2d 1103. The State presented evidence through the police officers which tended to show that these items were at all times in the possession of the officers, or in the designated property rooms used for such purposes, and that such custody excluded the possibility of tampering prior to delivery to Robert Read, and also after delivery to him. The State must present only evidence which strongly suggests the whereabouts of the evidence at all times. *Jones v. State,* (1981) Ind., 425 N.E.2d 128; *Holt v. State,* (1980) Ind., 400 N.E.2d 130. The State is not required to exclude every possibility of tampering. *Hopkins v. State,* (1981) Ind., 429 N.E.2d 631; *Jones, supra.* The Indiana State Police chemist and analyst, Robert W. Read, received State's Exhibits 1, 2, 3, 5, 7, 9, 10, and 12, which were shown to be controlled substances with Officer Sheets' seal intact and the evidence showed these bags were sealed and initialed on February 15, 1980. The handling of these exhibits by Read and the chain of custody after Read's examination and analysis, were similarly testified to by the officers. The evidence was therefore sufficient to identify the exhibits as those seized by the police from the appellants and the court properly admitted them into evidence.

### IV

 Appellants contend that the trial court committed reversible error in denying their motion to compel discovery. The complaint in the brief is directed to the controlled substances and the obtaining of samples for the purpose of independent testing. Appellants rely upon *Brandon v. State,*

(1978) 268 Ind. 150, 159, 374 N.E.2d 504, 509, where this Court held that when there is a sufficient designation of the items sought to be discovered and where the items must be material to the defense, the trial court must grant the discovery motion unless the State makes a showing of paramount interest in non-disclosure.

In paragraph 6(c) of the Notice of Request for Discovery, the appellants requested "[a]ll items the State of Indiana intends to introduce or use as evidence in the trial of the [Appellants] or were used in preparation of the case against the [Appellants]." On June 10, 1980, the State responded to the request for discovery as follows:

"With the submission ... of 'any reports, lab sheets, working documents, calculations, raw data and analysis of any scientific tests performed on any physical or documentary evidence and exhibits. . . . 'to-wit: the original notes of the Indiana State Police laboratory technician who prepared the Report of Laboratory Examination submitted to Defendant's Counsel previously, the State has now completed its response to Defendant's Request for Discovery."

On July 8, 1980, a hearing was held on Appellants' motion for continuance in which Appellants alleged that the State failed to comply with the discovery request. Thomas Barr, Deputy Prosecutor, was questioned by David Colman. The two main concerns of defense counsel were the State's alleged failure to supply a list of witnesses and a list of exhibits, but the following exchange between Barr and Colman took place:

"Q. ... One other question, Mr. Barr. Our original notice of discovery asks, requests that we be provided with samples of the purported controlled substances in this case so that we might subject them to independent testing. Were samples ever made available to the defense?

A. The samples have always been as available as our office could make them. I don't know what the real logistics of that would be. I don't think we could actually be expected

to go to Indianapolis to get samples or to bring them back and turn them over to defense counsel. Uh, and it was never really specified how those were to be provided. They were there. They've been either in the lab or in the property room at all times. Could have been—could have been gotten if arrangements were made.

Q. You were aware of the request, were you not?

A. Yes, we had discussed that.

Q. And did you make any effort to set up any sort of logistical plan to uh, allow that request to be perfected by the defense, gaining access to these purported controlled substance (sic) for testing purposes?

A. No I didn't and no plan was presented to me."

After the questioning was concluded, the defense counsel made a lengthy closing argument concerning the prosecution's failure to supply a list of witnesses, the proposed introduction of a lease, and the addition of new witnesses, but never mentioned the prosecution's failure to supply samples of the controlled substances.

We do not find any error in refusing the motion to compel discovery. In *Hale v. State,* (1967) 248 Ind. 630, 230 N.E.2d 432, this Court held that the negligent destruction or withholding of material evidence by the prosecution would present grounds for reversal on a due process theory but such evidence must first have been determined to be material. *Id.* at 635–36, 230 N.E.2d at 435. In the case at bar Appellants made no effort to affirmatively demonstrate that the evidence was material. No evidence was introduced to show that the independent analysis of the controlled substances would have exculpated them, nor did they introduce any expert testimony contradicting the chemical reports submitted by the State. The record shows that the State handed over the results of the laboratory testing to the defense with sufficient time for a defense witness to examine those results prior to trial. There is no error on this issue. *See Schwartz v. State,* (1978) 177 Ind.App. 258, 379 N.E.2d 480.

V

Appellants Garnet Everroad, Mark Smith, and Nancy Calender claimed there was insufficient evidence to find them guilty of a conspiracy to deal in a controlled substance and guilty of possession of cocaine.

This Court will neither weigh the evidence nor judge the credibility of the witnesses but will look only to the evidence most favorable to the State with all reasonable inferences that may be drawn therefrom. *Lewis v. State,* (1982) Ind., 438 N.E.2d 289; *Borden v. State,* (1980) Ind., 400 N.E.2d 1368. If probative evidence can be found to prove each element of an offense beyond a reasonable doubt, a conviction will be affirmed. *Lewis, supra; Marsh v. State,* (1979) Ind., 396 N.E.2d 883. It is for the trier of fact to reject an appellant's version of what happened, to determine all inferences arising from the evidence, and to decide which witnesses to believe. *Hill v. State,* (1979) Ind., 394 N.E.2d 132; *Bryant v. State,* (1978) 268 Ind. 498, 376 N.E.2d 1123.

The evidence shows that Henning met with Officer Sheets at the Green Acres Tavern and had in his possession a sample or "tester" containing one ounce of white powder that was determined to be cocaine. He made a deal to sell a pound of cocaine but said he had to go to his partner to get it. He made a telephone call and told Officer Sheets the package was ready. They then drove to the Everroad residence and Henning received the cocaine, all packaged and ready to be delivered. Henning went to the back door without anything in his hands and was handed something by a tall man who was not Everroad. Sheets said the person could not have been Everroad but could have been Mark Smith, who was 6'7" tall and was at the residence. There was evidence that Smith did not live at the place but had been there from time to time and had been there the previous evening.

Everroad, Smith and Calender were the only ones in the house when the police entered it. There was evidence that something had been burned in the stove while the police were attempting to get into the house. There were "baggies" containing cocaine inside the house, and many "baggies" and drug related paraphernalia from which the jury could infer that a drug selling operation was taking place. Nancy Calender's automobile was parked at the premises and a great deal of marijuana was found in the trunk. The keys to this automobile were in the house and the evidence showed that Nancy Calender was Everroad's girlfriend and spent a great deal of time there. She kept the house and, in fact, purchased the "baggies" that were used in the drug operation and the phone was in her name. In addition to the tested material showing traces of cocaine in many of the "baggies," there were also other "baggies" showing traces of white powder, which were not tested. Henning delivered the pound of cocaine to Sheets and then ran with the money when Sheets identified himself as a police officer. When Henning was later arrested, he had in his possession a plastic bag containing 30.2 grams of cocaine and most of the money received from Sheets in his possession. There were, therefore, sufficient facts from which the jury could find or infer that all of these appellants conspired together to deal in the sale of cocaine, a contolled substance, and were also guilty of possession of cocaine. The weight of the evidence and credibility of the witnesses was within the province of the jury and the evidence was sufficient for them to reach the verdicts they did. In view of the part taken by all three appellants in this transaction, and in the apparent drug selling operation in the house, the trial court properly allowed the verdicts to stand.

Appellant Everroad was also found guilty of possession of methaqualone and marijuana. Defense counsel asserts that these substances were found in Nancy Calender's car, not in Everroad's house. In support of this assertion, defense counsel points to Officer Sheets' testimony where he believed no plant-like substances were found in the house; however, Officer Williams was also positive that through his own observations, marijuana was found in the house. This discrepancy between the State's witnesses is to be resolved by the jury. Possession of a controlled substance may be founded upon either actual or constructive possession. As lessee of the house, Everroad could control the activities inside. *Haynes v. State,* (1982) Ind., 431 N.E.2d 83. Because of the drug-dealing operation taking place within the house, it is reasonable for the jury to find that Everroad was also in possession of marijuana found in the house or on the premises. The keys to the car trunk where four pounds of marijuana was found were lying loose on the counter in the home. There was sufficient evidence to convict Everroad on possession of marijuana.

## VI

Finally, Appellants contend the trial court committed reversible error in overruling their Motion to Suppress Evidence. This motion was directed to items of controlled substances obtained by use of a search warrant. After Appellants were arrested, the police secured the premises and obtained a search warrant from a Brown County judge. Appellants contend that the search warrant was overly broad because it included vehicles located on the Everroad premises. They further claim the affidavit in support of the search warrant application was not sufficient to support a finding of probable cause that controlled substances were still in the Everroad residence after Henning left it.

 Officer Sheets was the affiant applying for the search warrant. Included in the warrant was authority to search the premises as well as several vehicles parked on the premises. These vehicles all belonged to the appellants. One of them had been driven there by Henning when he led Officer Sheets to the premises. Two Ford vans were owned by Mark Smith and a Chevrolet Monte Carlo automobile was owned by Nancy Calender. The affidavit

for search warrant stated the chain of events, including a meeting at Sambo's restaurant in Franklin, Indiana, and the events leading to the encounter at the residence, including the discharging of a firearm at Sheets when he approached the premises. The facts in the affidavit were within the personal knowledge of affiant Sheets and were based on his observations. *Madden v. State,* (1975) 263 Ind. 223, 328 N.E.2d 727. Appellants give us no good reason to hold that it was improper or too broad for the court to issue a search warrant for the residence as well as for the vehicles adjacent to it driven there by the appellants. Because the facts in the affidavit supported inferences that drugs were being transported in and out of the premises for purposes of sale by the appellants, it was reasonable to search the vehicles as well as the residence.

■■■■■ Appellants claim the police also searched the premises before obtaining the search warrant and had the materials discovered and placed for easy access before the search warrant was actually issued. First, the appellants concede that the police were arguably justified in securing the Everroad house based on the belief of Officer Sheets that a firearm had been discharged from the house. *Chimel v. California,* (1969) 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685. The evidence shows however, that the police did no more than search for occupants of the house and did look in closets and areas large enough for someone to conceal themselves in, but refrained from looking in drawers or anywhere that one might expect controlled substances to be hidden. Nancy Calender testified she did not see any drawers opened nor anyone looking in drawers, nor did she see anyone look under anything or pick up anything. She said police officers were just walking around looking at things and looking behind doors. Officer Sheets testified he was in the house within a minute of the time the first officer got in and that he did not see anyone open any drawers or cabinets. All officers had been admonished not to search until they had a search warrant. All officers testified that they made no search be-

fore they had a search warrant authorizing them to do so. They did observe items that were in open view, such as "baggies" containing white powder, and a quantity of what was thought to be hashish on the counter in the kitchen. Another argument used by Appellants against the search is that Henning had told Sheets he could produce only one pound of cocaine and could not produce a kilo. Appellants' reasoning that this, therefore, was an indication that there was no more cocaine in the house except that which Henning delivered to Sheets for the sale. This argument, of course, does not merit suppression of the materials found under the search warrant. The fact that Henning said the amount of cocaine was limited depends for its veracity on his credibility and his reasons for limiting the sale to one pound. Perhaps there was other cocaine that was being saved for other customers. There also was a remark that they thought when they heard the police yelling outside that there was a "rip-off" involved and Henning did not want to give the impression that there was more than one pound available. There were sufficient facts in the affidavit of Sheets authorizing the court to issue the search warrant. A magistrate need only find there is probable cause to issue a search warrant which is based upon probability of criminal activity and not necessarily upon a *prima facie* showing that there is criminal conduct or that contraband will be found. To prevail upon a contention that the affidavit for a search warrant contained information known to be false, the defendant must show that relevant matter as expressed in the affidavit was untrue. *Phelan v. State,* (1980) Ind., 406 N.E.2d 237. There is no such showing here. The suppression motion was properly overruled.

The trial court is in all things affirmed.

GIVAN, C.J., DeBRULER and PRENTICE, JJ., concur.

HUNTER, J., concurs in result.