**Gary BURRIS, Defendant-Appellant,**

v.

**STATE of Indiana, Plaintiff-Appellee.**

**No. 981 S 250.**

Supreme Court of Indiana.

June 29, 1984.

Rehearing Denied Aug. 22, 1984.

James G. Holland, Mendelson, Kennedy, Miller, Muller & Hall, Indianapolis, for defendant-appellant.

Linley E. Pearson, Atty. Gen. of Ind., Joseph N. Stevenson, Deputy Atty. Gen., Indianapolis, for plaintiff-appellee.

PIVARNIK, Justice.

Defendant-appellant Gary Burris was convicted of Murder, Ind.Code § 35–42–1–1 (Burns Repl.1979), at the conclusion of a jury trial in Marion Superior Court on December 4, 1980. The State sought the death penalty and the jury returned a recommendation of death. The trial court sentenced Burris to death on February 20, 1981. After several extensions of time in which to file his appellate brief, Burris now appeals his conviction and sentence.

The defendant raises twelve errors on appeal, concerning:

1) whether the jury was improperly selected because of the questioning methods used during voir dire;

2) whether the information for felony-murder is insufficient by its failure to specifically include the intent element of the underlying robbery in its language;

3) whether the trial court erred in admitting certain evidence seized from the apartment where the defendant was arrested;

4) whether the trial court erred in failing to disclose to the jury the full details of a plea agreement made to a witness for the prosecution;

5) whether certain physical evidence was erroneously admitted because of alleged breaks in the chain of custody;

6) whether final instruction 32 properly covered subsidiary and incidental evidence;

7) whether the prosecutor used inflammatory and prejudicial language in the final argument of the penalty phase of trial;

8) whether the jury was properly instructed on weighing aggravating and mitigating circumstances, and whether the jury should return written findings of fact;

9) whether the trial court erred in imposing the death penalty without a specific jury determination that the defendant had been convicted of murder as a principal or as an accomplice;

10) whether there is proportionality review of death penalty cases in Indiana;

11) whether the defendant received effective assistance of counsel during the trial court proceedings; and

12) whether there is sufficient evidence to support the trial court's findings as to the existence of an aggravating circumstance justifying the death penalty.

The evidence most favorable to the State reveals that on the morning of January 29, 1980, Gwen Tevebaugh and her neighbor, Calvin Howard, discovered the body of a dead man in an alley in the 3200 block of East Fall Creek Parkway in Indianapolis. Tevebaugh had been awakened earlier that morning by a noise and then heard what she clearly knew to be a gunshot. Tevebaugh was not able to see anything because of the darkness but she noted the time of 2:23 on her clock.

After Mr. Howard phoned the police, Sergeant Donald Campbell and Officer Jon Layton received the dispatch on the homicide. Upon arriving at the alley, the two men discovered the body, nude except for a pair of socks, lying face down and stuck to the ground by a pool of its frozen blood. Identification found at the scene showed that the deceased was Kenneth W. Chambers, age 31. The police also noticed what appeared to be a small caliber gunshot wound to the right temple.

Elizabeth Gardner, a dispatcher for the Northside Cab Company, identified Chambers as a driver for the company. Chambers drove Cab 305. On the morning of January 29, 1980, both Chambers and Gardner were working. Around 1:30 a.m. Gardner received a call for a cab to pick up fares at the 1800 block of North College. Gardner put a request out for a cab and Chambers responded that he would take the call. Both parties stipulated that a call to Northside Cab was received at 1:48 a.m. for transportation from 1821 North College to 1501 East 38th and that this call was assigned to Cab 305. The call was made by a person identified as "Williams."

1821 North College is the address of the M & J Social Club where Thelma Williams was employed as a barmaid. Williams testified that she telephoned the cab company

at the request of defendant Burris. Williams said she knew the defendant and stated he usually ran around with two other men, named "Emmett" and "James." As Williams recalled, Emmett was with Burris at the M & J Social Club on the morning of the murder. Williams assumed the cab arrived within fifteen minutes of her call because Burris left at that time.

Carol Wilkins was another witness called by the State. At the time of the murder, Carol Wilkins was living at 1827 North College above the M & J Social Club. Carol stated that defendant Burris rented the apartment and that he was dating her sister, Debra Wilkins. On January 28, the day before the murder, the defendant arrived at the apartment around 5:40 p.m. Carol testified that James Thompson and Emmett Merriweather joined the defendant. Burris had told Carol that he had a deadline to pay $230 back rent and telephone bills. That evening when Burris left the apartment, he put a .38 pistol in his pocket. Carol identified State's Exhibit 16 as being similar to the .38 pistol.

Later, Burris, Merriweather, and Thompson returned to the apartment. Burris was carrying a clipboard with a paper on it, which he tossed on the bed. Carol had ridden in taxicabs before and recognized the paper on the clipboard as a cab driver's run sheet. The defendant burned the run sheet and flushed the remains down the toilet.

Merriweather and the defendant then had a dispute over a gun. The defendant wanted to give Merriweather the gun but Merriweather refused to take it. The defendant kept the gun. Carol also saw that the defendant had quite a bit of money. There were two wads of money, big enough to create a noticeable bulge in both of the defendant's front pockets. Carol later heard about the cab driver who had been shot and she put the pieces together.

After some police investigation, Emmett Merriweather and James Thompson were arrested in connection with the death of Chambers. Both men, along with other sources, informed the police that the de-

fendant was with them at the time of the murder. Acting upon information that defendant Burris was at Debra Wilkins' apartment and planned to leave town, the police moved quickly and arrested Burris at 2035 North Meridian in Indianapolis. A search of the apartment revealed that a sawed-off shotgun and a .38 pistol were hidden in a stereo speaker. A member of the Indianapolis Police Department Crime Lab testified that the .38 pistol was used to kill Chambers. This witness, during the penalty phase of the trial, also testified that the pull of the pistol's trigger made it a little harder to shoot than an average weapon. The gun had no observable mechanical defect and did not exhibit any propensity for accidental discharge.

A pathologist, Dr. Robert Ransburg, testified that the body had a gunshot entrance wound in the right temple. Dr. Ransburg stated that the wound was a "contact wound." By this he meant that the muzzle of the gun would have had to have been held against the temple to create such a wound. Other forensic specialists testified that the victim's blood type and the bloodstain on the recovered .38 pistol were both type A.

One of the chief witnesses for the prosecution was William Allen Kirby. Kirby had shared a cell with defendant Burris in the Marion County Jail where the defendant admitted his involvement and culpability in the murder. Kirby agreed to testify against the defendant and recounted the defendant's story as follows: The defendant and his friends were in need of money. They entered a dance contest but failed to win anything. They took a cab to the "M & L Club" (Kirby said he was not sure "M & J Social Club" was what the defendant said but he knew the name was alphabetical) and on the way to the club, the defendant saw an envelope containing money on the front seat of the cab. Kirby asked why the men did not take the money at that time. The defendant replied they were not prepared to do so because they did not have their "roscoes" (pistols).

Inside the "M & J Social Club" the defendant said to his friends that he was ready to get some "paper" (money). Defendant Burris told his accomplices that he would kill during the robbery if that would keep him out of prison. Burris went up to his apartment, picked up a pistol, and had Thelma Williams call for a cab.

After the cab arrived, the defendant and the other two men told the driver to proceed to 21st and Alvord. After proceeding only a couple of blocks on 21st, the three men drew their pistols, forced the driver to call in that his run was completed, and ordered the driver into the back seat. The cab was driven to an alley off 34th Street where the cab driver's clothes were thrown out. Then, in an alley between Guilford and Fall Creek Parkway, the driver was forced out of the cab. The driver pleaded for his life, saying, "Man, take the money, take the cab, leave me alone, I'm not going to bust you, you know, I'm a street fellow, too." This plea for mercy had no effect on the defendant. The victim's hands were bound and then the defendant shot Chambers in the head. The defendant told Kirby he used .38 hollow point shells because he thought they would explode on impact and thus leave nothing that could be identified through ballistics.

## I

In this first issue, four of the defendant's arguments will be considered together because of their similar nature. The defendant objects to the selection of a jury which he describes as "death qualified." Using Burris' definition, in such a jury, prospective jurors who admit on *voir dire* that they are precluded from *ever* voting for the death penalty are excused for cause. The defendant claims error in the procedure used for selecting the jury on the following grounds:

—There was an insufficient showing that the five jurors who were excluded for cause could not follow the trial court's instructions concerning recommendation of the death penalty.

—A death qualified jury is unfair because it does not represent a cross-section of the community and it is more inclined to convict the accused of murder.

—The trial court did not determine whether the remaining jurors would automatically vote for the death penalty and thus exclude them for cause.

—Asking questions concerning the death penalty in a group *voir dire* setting impermissibly prejudices the jury.

■■■ This Court adopted the language used by the United States Supreme Court in *Witherspoon v. Illinois,* (1968) 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776:

> "[A] sentence of death cannot be carried out if the jury that imposed or recommended it was chosen by excluding veniremen for cause simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction. No defendant can constitutionally be put to death at the hands of a tribunal so selected."

*Monserrate v. State,* (1971) 256 Ind. 623, 625, 271 N.E.2d 420, 421. Prospective veniremen may be excused for cause who state that they would not consider returning a verdict of death. *Witherspoon, supra; Hoskins v. State,* (1982) Ind., 441 N.E.2d 419. The United States Supreme Court, in decisions rendered after *Witherspoon,* repeated its assertion that the "State may bar from jury service those whose beliefs about capital punishment would lead them to ignore the law or violate their oaths." *Adams v. Texas,* (1980) 448 U.S. 38, 50, 100 S.Ct. 2521, 2529, 65 L.Ed.2d 581, 593. The trial court may exclude a juror for cause if he is not willing to consider all of the penalties provided by state law and he is irrevocably committed to vote against the death penalty prior to trial. *Lamar v. State,* (1977) 266 Ind. 689, 699, 366 N.E.2d 652, 656.

■■ The five prospective jurors who were excused for cause all stated that they would never recommend imposition of the death penalty, no matter what the evidence

revealed. The following exchange between the trial court and prospective juror # 5 illustrates the type of questions asked of, and the answers given by, the other jurors excused for cause:

Q You've heard the questions I've asked the four prior jurors, and I would ask you that same question, whether or not you have any moral, social, religious, or conscientious objections against the death penalty that would prohibit you from considering it.

A (Juror # 5) I just—no, I couldn't do that.

Q Pardon?

A (Juror # 5) I just couldn't.

Q I'm sorry, I couldn't hear you.

A (Juror # 5) I just couldn't do that.

Q Are you so unalterably opposed to the death penalty that you could not consider it in any way, no matter what the evidence would show?

A (Juror # 5) Yes, I am.

Q In other words, you have your mind made up now that you could not, is that—are you telling me that you could not now vote for guilty, knowing that the death penalty may come later or could not, under any circumstances, recommend it, no matter what the evidence?

A (Juror # 5) No, I couldn't.

Q And they are so affixed (sic) in your mind that you could tell this Court now that you could not even consider it, is that right?

A (Juror # 5) Yes.

Q In other words, as you well know, there may be people who have objections to the death penalty, but that they take an oath as jurors to follow the law and the evidence, even though they have their own personal objections they might be able to consider it, do you understand that?

A (Juror # 5) Yes, I understand that.

Q Are you telling the Court that you now are so opposed to it that you couldn't even consider it, and you are now of that opinion?

A (Juror # 5) Yes.

THE COURT: All right, State have any questions on this?

MR. GARRISON: We have none, Judge.

THE COURT: Defense?

MR. ALSIP: We have no questions, Your Honor.

THE COURT: All right, you may be excused, then, ma'am.

A perusal of the record shows that all of the excused veniremen stated that under no circumstances would they consider imposition of the death penalty. Thus, they were properly excused for cause under the standards found in *Witherspoon* and other cases. *Hoskins, supra,* 441 N.E.2d at 421.

The defendant next contends that a jury in which veniremen opposed to the death penalty are excluded violates his right to an impartial jury that "must represent a fair cross-section of the community." *Taylor v. Louisiana,* (1975) 419 U.S. 522, 95 S.Ct. 692, 42 L.Ed.2d 690. He also claims that such a jury tends to be conviction-prone; however, he presents little evidence backing up this claim. These arguments have been rejected previously by this Court and other jurisdictions. *Fielden v. State,* (1982) Ind., 437 N.E.2d 986; *Wheeler v. State,* (1970) 255 Ind. 395, 264 N.E.2d 600. *Accord, Smith v. Balkcom,* (5th Cir.1981) 660 F.2d 573, *cert. denied* (1982) 459 U.S. 882, 103 S.Ct. 181, 74 L.Ed.2d 148. Defendant Burris would have us hold that his right to an impartial jury has been violated because certain veniremen opposed to the death penalty have been excluded; yet, at the same time, he would have us ignore the State's valid right to exclude persons who cannot be fair to its position when seeking a penalty of death. Of paramount interest here is an impartial jury *drawn* from a fair cross-section of the community. Defendant does not allege that the representative pool from which the final jury was drawn systematically excluded certain groups or classes of people, thereby failing to constitute a fair cross-section of the community. Instead, he argues that people irrevocably committed to vote against the death penal-

ty prior to trial represent members of the community and as such cannot be excluded for cause.

 Taking Burris' argument to its logical conclusion would obviate any need for *voir dire*. Instead, the first twelve people listed would have to be seated because they come from a pool representing a fair cross-section of the community. Thus, under the above argument, the defendant would be estopped from striking potential jurors who dislike the color of his skin because they, regrettably, would also represent a fair cross-section of the community. The purpose of the *voir dire* is to weed out potential jurors who demonstrate that they cannot be fair to *either* side of the case. *Smith, supra,* at 578. The State as well as the accused enjoys a right to an impartial jury. *Hayes v. Missouri,* (1887) 120 U.S. 68, 7 S.Ct. 350, 30 L.Ed. 578. Burris has not persuaded us that he was denied an impartial jury nor has he convinced us that a jury composed of people who are not irrevocably opposed to the death penalty tends to be more conviction-prone. Instead, his argument highlights an imperfect system which acknowledges that there are strong competing interests on both sides. The federal court in *Smith, supra,* succinctly analyzed this problem:

"[Taylor v. Louisiana] clearly establishes that the 'venires from which juries are drawn must not systematically exclude distinctive groups in the community and thereby fail to be reasonably representative thereof.' In reliance on *Taylor,* Smith urges that death-opposed jurors comprise a distinctive group whose systematic exclusion violates the sixth amendment. Although the fair cross-section requirement does not mean that the jury actually chosen must mirror the community and reflect the various distinctive groups in the population, *id.,* the Supreme Court's opinions concerning the jury trial guarantee do intimate that this sixth amendment right comprehends a *fair possibility* for obtaining a jury which is representative of the community. *See Peters v. Kiff,* 407 U.S. 493, 500, 92 S.Ct. 2163, 2167, 33 L.Ed.2d 83 (1972); *Williams v. Florida,* 399 U.S. 78, 100, 90 S.Ct. 1893, 1905, 26 L.Ed. 466 (1970). The exclusion of veniremen unalterably opposed to the death penalty undoubtedly reduces the possibility of obtaining a jury which represents a true cross-section of the community. Any elimination of prospective jurors who are disqualified potentially impairs the achievement of a true cross-section on the particular jury. Nevertheless it must be remembered that a jury which reflects a fair cross-section of the community is a goal that is never to be achieved at the cost of leaving on the jury those veniremen who are legitimately disqualified. As the Supreme Court has observed, 'The fair cross section principle must have much leeway in application. The States remain free to prescribe relevant qualifications for their jurors and to provide reasonable exemptions so long as it may be fairly said that the jury list or panels are representative of the community.' [*Taylor v. Louisiana,* (1975) 419 U.S. 522, 537–38, 95 S.Ct. 692, 701, 42 L.Ed.2d 690, 702]." (emphasis in original; footnotes omitted)

Defendant Burris raises as another issue the assertion that the trial court did not adequately insure that any seated juror would not automatically vote for the death penalty once the defendant was convicted. He also claims that our death penalty statute, Ind.Code § 35–50–2–9 (Burns Repl. 1979), is defective in not providing for the removal of such persons.

The defendant admits that all of the jury panelists were asked, either directly or by referring to questions put to other panelists, whether they could consider recommending against death in case of a conviction of guilt. The defendant feels, however, that the questioning by reference was insufficient and that juror 12 was never questioned on this issue, either directly or indirectly.

The record shows that the defense asked all jurors then seated if the "mere finding of guilt" would predispose them to recommend the imposition of the death penalty.

The defense later asked the jurors if they understood that before they could recommend the death penalty, they must first find an aggravating circumstance and weigh any mitigating circumstances against it. Subsequently, the prospective juror in the twelfth position was replaced by a woman who was then asked if she had heard the previous questions. The woman replied that she had and replied that she would not answer the questions any differently from the other jurors. The prosecutor informed the new juror 12 that her job in deciding whether or not to recommend the death penalty was to weigh the mitigating circumstances against the aggravating circumstances. Juror 12 stated that she understood her responsibility to both parties and could listen to the instructions and "function as an upright juror."

It is the duty of each juror to answer all questions on *voir dire* fully and truthfully. *McFarland v. State,* (1979) 271 Ind. 105, 390 N.E.2d 989; *Johnston v. State,* (1958) 239 Ind. 77, 155 N.E. 129. The record of this *voir dire* shows that all jurors were aware of their proper role in the penalty phase and indicated that they would follow the instructions of the trial court. Defendant has not shown that anything improper occurred during the *voir dire* or that any of the jurors answered untruthfully when questioned during the *voir dire.*

Defendant also claims that Ind.Code § 35–50–2–9 is unconstitutional because it does not require removal of any juror who says he will automatically vote to impose the death penalty following conviction. First of all, there has been no harm to the defendant because no juror stated he or she favored automatic imposition of the death penalty. Second, Ind.Code § 35–50–2–9 does not permit an automatic recommendation of death. Under section (e), the jury may recommend the death penalty *only* if it finds: "(1) That the state has proved beyond a reasonable doubt that at least one [1] of the aggravating circumstances exist; and (2) That any mitigating circumstances that exist are outweighed by the aggravating circumstance or circumstances." Thus, the statute mandates a procedure where juries must apply a high standard of proof of aggravation as a threshold matter and then weigh countervailing circumstances against it. It is highly unlikely that a trial court would permit a juror to serve who states that he or she could not follow the law. Defendant's argument that § 35–50–2–9 is unconstitutional because it does not provide for the removal of jurors must fail.

The defendant argues that inquiring about the death penalty while the prospective jurors are seated as a group impermissibly prejudices his chances for a fair trial. Burris feels that when a prospective juror answers that he or she is not opposed to the death penalty, the other jurors who listen to the question and answer conclude that death is the appropriate penalty. We find that this issue has been waived because the defendant did not object to the group *voir dire.* Failure to make an objection at trial results in a waiver of the alleged error on appeal. *Pounds v. State,* (1983) Ind., 443 N.E.2d 1193; *Davidson v. State,* (1982) Ind., 442 N.E.2d 1076. It is well settled in Indiana that the trial court has broad discretion in controlling the *voir dire;* only an abuse of that discretion will result in a reversal. *Roberts v. State,* (1978) 268 Ind. 127, 373 N.E.2d 1103. In this situation, nothing highly unusual or potentially damaging to the defendant was brought to the trial court's attention that would have required individual examination of the prospective jurors. There was no error in the *voir dire.*

## II

The defendant claims that the information filed in which he was charged with felony murder was inadequate. Specifically, he argues that one element of robbery was omitted from the information and thus the jury's verdict of guilty should be overturned. The State points out that nowhere in the three motions to correct errors does the defendant raise this error. Since it is not found in a motion to correct

errors, the alleged error should be deemed waived. *Brown v. State,* (1983) Ind., 445 N.E.2d 82; *Wickliffe v. State,* (1981) Ind., 424 N.E.2d 1007.

Assuming, *arguendo,* that this issue has not been waived, we must examine the language used in the information. Omitting captions and formal parts, the information charging defendant Burris with felony murder reads as follows:

Did kill one KENNETH W. CHAMBERS, while in the commission of Robbery, a felony, in that the said EMMETT MERRIWEATHER, JAMES THOMPSON AND GARY BURRIS, did take property from the possession of the said KENNETH W. CHAMBERS, to-wit: U.S. CURRENCY, by means of force and threat of force against the person of the said KENNETH W. CHAMBERS. Said EMMETT MERRIWEATHER, JAMES THOMPSON AND GARY BURRIS killed KENNETH W. CHAMBERS by shooting at and against the body of the said KENNETH W. CHAMBERS, with a handgun, loaded with gun powder and metal bullets, inflicting a mortal wound upon the body of the said KENNETH W. CHAMBERS, as the result of which wound the said KENNETH W. CHAMBERS did then and there and thereby die....

At the time the murder occurred, Ind. Code § 35–42–5–1 (Burns Repl.1979) defined Robbery as:

A person who knowingly or intentionally takes property from another person or from the presence of another person:

(1) By using or threatening the use of force on any person; or

(2) By putting any person in fear; commits robbery, a class C felony. However, the offense is a class B felony if it is committed while armed with a deadly weapon, and a class A felony if it results in either bodily injury or serious bodily injury to any other person.

Defendant Burris argues that he was not charged with the crime of robbery because the information failed to allege that he knowingly or intentionally took the money from the victim. Thus, the defendant argues under Ind.Code § 35–3.1–1–2 (Burns Repl.1979) (now repealed), Burris cannot be convicted of felony murder because the information failed to set "forth the nature and the elements of the offense charged in plain and concise language...." We do not find the information to be defective. An information must state the crime in words of the statute or words that convey a similar meaning. *Smith v. State,* (1983) Ind., 445 N.E.2d 998; *Askew v. State,* (1982) Ind., 439 N.E.2d 1350. The information did allege that the murder was committed "while in the commission of Robbery, a felony." Measured by the standards in *Smith,* the information could not have misled the defendant and he does not claim that he was misled. Instead, he makes a sufficiency argument out of this alleged error. The language of the information was sufficiently certain and particular so as to enable the accused, the trial court, and the jury to determine the crime for which the conviction was sought, and to give defendant Burris sufficient information to prepare his defense, assure against double jeopardy, and anticipate the proof which would be adduced against him. *Fadell v. State,* (1983) Ind.App., 450 N.E.2d 109. Parenthetically, we note that the jury instructions accurately state the essential elements of the crime of robbery, including the requisite states of mind. We find no harm to the defendant under this issue.

### III

Defendant Burris was arrested in the apartment leased by Debra Wilkins. The police handcuffed the defendant and then made a quick search of the apartment but did not turn up any relevant evidence. At the time of the arrest, the police did not have an arrest warrant for Burris nor did they have a search warrant for Wilkins' apartment. Wilkins accompanied the police to the station where she signed a consent to search form. The police returned to her apartment and found the murder weapon in a stereo speaker.

Prior to the *voir dire*, the defendant moved to suppress the introduction of the handgun. Burris alleged that the evidence was illegally obtained because a valid consent to search had not been given. Two witnesses were called to testify: Debra Wilkins, and Donald Campbell, one of the arresting officers. At the conclusion of the hearing, the trial court denied the motion to suppress. The trial court felt that the defendant did not have a reasonable expectation of privacy in the premises where the gun was found, and that consent to search was given voluntarily by Debra Wilkins.

Upon appeal, the defendant's argument raises a number of attacks on the nature of his arrest and the search of the premises where he was arrested, Debra Wilkins' apartment. After distilling the defendant's allegations, there are only two relevant inquiries concerning the allegedly improper admission of the murder weapon:

1. the defendant's right to object to a search of the premises; and,

2. whether Debra Wilkins' consent to a search of her apartment was voluntarily given.

A defendant has no constitutional right to challenge the search and seizure of another person's property. *Hope v. State,* (1982) Ind., 438 N.E.2d 273; *Johnson v. State,* (1979) 271 Ind. 145, 390 N.E.2d 1005, *cert. denied,* 444 U.S. 944, 100 S.Ct. 302, 62 L.Ed.2d 312. In Fourth Amendment cases, the initial question which must be answered is whether the person who is aggrieved had any personal and legitimate expectation of privacy in the place searched. *Humes v. State,* (1981) Ind., 426 N.E.2d 379, citing *Rakas v. Illinois,* (1978) 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387. In *Humes,* letters written by the defendant to a woman named Harbin were taken from Harbin's house pursuant to a search warrant. Humes argued that he had a legitimate expectation of privacy in the premises searched and, therefore, had standing to challenge the validity of the search warrant. This Court noted, however, that Humes had no proprietary interest in Harbin's house. Humes was

Harbin's friend and sometimes stayed at her house for extended periods of time. However, other people, such as a daughter, a brother, and another friend, also regularly stayed in Harbin's house. As the Court stated, "[d]efendant never asserted any property interest in the house and exercised no dominion or control over it." 426 N.E.2d at 381.

The situation in the matter at hand is similar to that found in *Humes.* The transcript of the suppression hearing reveals that Burris was a boyfriend of Debra Wilkins, maintained his own apartment where Carol Wilkins stayed but he "hardly ever" stayed there, and on the morning of January 30, 1980, he was asleep at Debra's apartment. Burris maintained a relationship with Debra but he did not show that he frequently stayed with her or that the relationship was the reason he was absent from his apartment. The State showed at the hearing that Debra lived in the apartment for nearly ten months. She paid the rent and had telephone service in her name. The defendant did not show that he had stayed there any more than one night. Although it is probable that he spent other nights there, Burris had not shown how often or how long, and clearly failed to establish that he "lived" in Debra Wilkins' apartment.

It is difficult to see how the trial court could come up with any decision but the one it reached. The defendant has not shown any proprietary interest in Debra Wilkins' apartment. During the trial the defendant renewed his objections when the handgun was introduced. He later introduced evidence that he had stereo speakers in her apartment and that he lived with Debra "off and on" but Debra Wilkins rebutted this, testifying that on January 30, 1980, she "didn't live with him." The trial court was correct in determining that the defendant had no standing to challenge the search of the apartment.

Now we turn to decide whether the consent to search form was voluntarily signed by Debra Wilkins. "It is clear that a con-

sent [to search] will be valid except where it was procured by fraud, duress. fear, intimidation, or where it is a mere submission to the supremacy of the law. Voluntariness is a question of fact to be determined from all of the circumstances. (citations omitted)" *Darnell v. State,* (1982) Ind., 435 N.E.2d 250, 254.

 Debra Wilkins agreed to go to the police station for questioning but she was not placed under arrest. The form Wilkins signed informed her that she had the right to refuse a search and demand that a search warrant be issued prior to any search of her apartment. The form also acknowledged that she signed the form of her own free will and that no threats or promises had been made to her. Debra Wilkins stated at the hearing that she had not been threatened and that the police had encouraged her to deal truthfully with them. The police admitted that when they initially entered the apartment their guns were drawn because they had been told by one of the defendant's accomplices that he (defendant) was armed and dangerous. This may have frightened Wilkins as the defendant claims but this fact does not outweigh the voluntariness because Wilkins was first taken to the police station where she later consented to a search of her apartment. Wilkins stated that she understood her rights when she signed the form. Thus, the trial court was justified in holding that her consent was voluntary and the handgun was properly admitted into evidence.

## IV

Defendant argues that his conviction should be reversed because the State did not disclose the "deal" it struck with a witness, William Kirby, in order to get Mr. Kirby to testify. Kirby testified, as related above, about the murder as it was described to him by the defendant. This encounter took place in the Marion County Jail. At that time, Kirby was facing two counts of robbery, a count of being a habitual offender, and a minor drug charge. Kirby had reached a tentative agreement to plead guilty to the robberies and receive two fifteen-year sentences, to be served concurrently, while the habitual offender count would be dropped. The State alleges that after this plea agreement had already been reached, Kirby was asked to testify about the murder. In exchange for Kirby's cooperation in testifying, another five years would be taken off the robbery sentences. During the trial, Kirby stated that it was his friendship with the deceased, not the five-year reduction, that influenced his decision to testify. The defendant argues that this statement by Kirby and the events surrounding the plea agreement misled the jury and he should be awarded a new trial.

 We have long recognized that the prosecution is under a continuing duty to disclose any inducements offered in exchange for a witness' testimony. *Diggs v. State,* (1981) Ind., 429 N.E.2d 933. It is "the prosecutor's duty to voluntarily disclose evidence to the jury ... when a 'deal' [has been made] with a State's witness, such as promises, a grant of immunity, or a reward offered in return for testimony." *Carey v. State,* (1981) Ind., 416 N.E.2d 1252, 1257; *Campbell v. State,* (1980) Ind., 409 N.E.2d 568, 570.

When William Kirby took the stand in December, 1980, the prosecutor asked him if it was true that he was serving a ten year sentence as a result of pleading guilty to charges of robbery. Kirby answered that this was true. The guilty plea had been entered a few months earlier in August, 1980. The prosecutor then asked questions concerning Kirby's relationship with the defendant. From the questions and answers, it appeared that Kirby had been incarcerated, along with the defendant, in the Marion County Jail on February 7, 1980. The charges which caused Kirby to be arrested were the same charges that his later guilty plea agreement was based upon. The following exchange then took place between the prosecutor and Kirby:

Q Now, prior to that date, before the seventh (7th) of February, had you already reached an agreement with

the State of Indiana with regard to a plea of guilty?

A Yes.

Q And you were awaiting...

A Fifteen (15) ...

Q ... a hearing, at which time you were going to plead guilty for a sentence of fifteen (15) years, is that right?

A Right.

Q Subsequent to your providing information to me with regard to this case that plea agreement was amended, was it not, so that you would do a sentence of ten (10) years and not fifteen (15)?

A It was.

Kirby then recounted in great detail the events surrounding the murder as they had been told to him by the defendant. Just before the direct examination concluded, the prosecutor again raised the topic of reducing the fifteen year sentence to ten years:

Q ... And your agreement with the State of Indiana to plead guilty to the charges which were pending against you at the time you had this information given to you by [the defendant] had already been reached at the time you took this statement.

A Yes.

Q And what happened was that, as a result of your agreement to cooperate and testify in this trial, you simply received a five (5) year reduction in the amount of time you would do.

A Yes, I received this, but this was not requested, you know, because I, you know, like I'm saying, you know, I am a criminal element, also. You see what I'm saying? But this was a (sic) act that I couldn't condone, this (meaning the victim) was a personal friend of mine, you know, and I told the prosecution, Prosecutor's Office, that I would testify irregardless (sic).

Q It's a fact, is it not, that at no time did you make a request for a reduc-tion in your sentence as a condition of your testifying?

A That's right.

■ The defendant still argues that the prosecutor misled the jury because he did not disclose all the facts surrounding the plea agreement. By this, the defendant is referring to the State's agreement to drop the habitual offender count and impose a four year term on the minor drug charge, which would then be served concurrently with the ten year robbery sentence. This allegation was one reason for conducting a hearing on the defendant's Second Belated Motion to Correct Errors. Sifting through the transcript of the hearing, we find that the State and Kirby had tentatively reached an agreement to drop the habitual offender count and impose two concurrent fifteen year terms on the robbery charges *before* Kirby ever met the defendant. Kirby had a co-defendant named Sisson who pleaded guilty to robbery and received a fifteen year sentence. It appears that the prosecutor in Kirby's case felt that Sisson was more culpable than Kirby and therefore, Kirby's sentence should not exceed Sisson's term of years. Gregory Garrison, who prosecuted defendant Burris, testified that he was informed by other prosecutors about the tentative agreement between the State and Kirby. Garrison stated at the hearing: "I indicated to [Kirby] that his existing plea bargain of fifteen years, might be reduced to some extent, contingent upon his testimony and his successful taking of a polygraph examination...."

The prosecutor voluntarily disclosed the agreement made with Kirby: a reduction of his fifteen year sentence to ten years. The defense had access to the materials surrounding the guilty plea and could have brought out these other allegations in order to try to impeach Kirby on cross-examination. *See Conrad v. State*, (1980) 273 Ind. 587, 406 N.E.2d 1167. The prosecutor is only obligated to disclose what inducement was used to gain the cooperation of the witness. In this case, the jury was informed that the witness' fifteen year sentence was the result of a plea agreement

and that it was reduced by five years as a result of Kirby's testimony. The prosecutor did not have to tell about the habitual offender count being dropped because that matter had been settled before Kirby agreed to testify. As for the defendant's other allegation that Kirby lied when he stated that he needed no inducement to testify, there is nothing in the record to support this allegation. Kirby had insisted all along that he would testify even if he did not receive the five year reduction. Although the final guilty plea was made contingent upon his presence as a witness, there still was no evidence that the State had to do this in order to gain his testimony. The State may have done this in order to fortify its position and warn Kirby that he could not be equivocal; however, it is still true, as was brought out before the jury, that Kirby never insisted upon the five year reduction before he agreed to testify. Thus, the jury was able to judge, both effectively and properly, the witness' credibility.

## V

■■■ The defendant argues that certain pieces of physical evidence should not have been admitted because of breaks in the "chain of custody or possession." Burris claims that no testimony was offered pertaining to the whereabouts of a bullet and a hair sample (Exhibits 24 and 25) between the days they were checked into the property room, January 30 and checked out, February 28, by Officer Koss. Defendant Burris also claims that there was no testimony concerning the whereabouts of the blood sample (Exhibit 26) between the times it was checked in, January 30, and checked out by the Indianapolis Police Department Serologist Kohlman, January 31. Thus, the defendant argues that the State failed in a duty to "show, by producing records or testimony, the continuous whereabouts of the exhibits," citing *Graham v. State*, (1970) 253 Ind. 525, 255 N.E.2d 652.

We have held that "[t]he showing as to a proper chain of custody is only that reasonable assurance be provided that the exhibit has passed through various hands in an undisturbed condition. *Holt v. State*, (1980) 272 Ind. 544, 400 N.E.2d 130. All possibilities of tampering need not be excluded. Id." *Moody v. State*, (1983) Ind., 448 N.E.2d 660. In *Moody*, there was a sufficient showing of chain of custody where a bullet was placed in a marked box, then marked by another officer and put back in the box, sealed in a bag, delivered for testing, and then the sealed bag was later picked up and introduced into evidence. In *Lloyd v. State*, (1983) Ind., 448 N.E.2d 1062, a bullet was removed from the victim's body during an autopsy and was given to one officer who then turned it over to another officer. The bullet was marked, placed in an evidence locker, removed for testing, returned to the evidence locker, and then finally introduced into evidence. The officer who marked the bullet testified that it was in substantially the same form and condition as when he first saw it. We held that this was a sufficient showing of chain of custody.

In the instant case, Dr. Ransburg personally marked the bullet (Exhibit 24) he removed from the victim's body before handing the bullet over to Officer Snell. Ransburg inspected Exhibit 24 during the trial and recognized his mark. He also initialed the envelopes in which the hair (Exhibit 25) and blood samples (Exhibit 26) were placed, and identified his initials and the hair and blood samples during the trial. Snell testified that he brought the same bullet to trial, and told how he marked the evidence box and sealed it. He stated that he dealt with the blood and hair samples in the same manner. In signing all three items he put down case number 709088E.

Ballistics expert Koss recognized the bullet exhibit by his marks. He also recognized the hair exhibit which he had obtained in a sealed condition from the property room, marked it, and tested it. Serologist Kohlman recognized the blood exhibit and identified her initials as well as Snell's initials, and said the sample was sealed when she obtained it. When she was through with the testing, she returned the

sample to the envelope, put a sticker on it, and initialed and dated it.

Defendant Burris does not suggest, nor does the transcript present any reason to suggest, that the three samples were tampered with in any manner. All three exhibits were positively identified and had been individually marked. The trial court did not commit error in allowing the exhibits to be introduced into evidence.

## VI

■■■ The defendant contends that Final Instruction 32 is erroneous because it misleads the jury and keeps the jury from considering subsidiary evidence. He claims that such instructions as this have been condemned by this Court and cites *White v. State*, (1955) 234 Ind. 209, 125 N.E.2d 705. Instruction 32 reads as follows:

It is necessary that every material element of the crime charged against the accused should be proved by the evidence beyond a reasonable doubt, but is (sic) is not necessary that all incidental or subsidiary facts should be proved beyond a reasonable doubt. Evidence is not considered in fragmentary parts as though each fact and circumstance stood apart from the others' but the entire evidence is to be considered and the weight of the testimony to be determined from the whole body of the evidence. A circumstance considered apart from the other evidence may be weak, if not improbable, but when viewed in connection with surrounding facts and circumstances may be so well supported as to remove all doubt as to its existence, as detailed by the witness. Acts considered apart from other evidence may appear innocent, but when considered with the other evidence may import guilt as well as innocence.

This same instruction has been approved by this Court at least three times since *White: Ringham v. State*, (1974) 261 Ind. 628, 308 N.E.2d 863; *James v. State*, (1976) 265 Ind. 384, 354 N.E.2d 236; *Emory v. State*, (1981) Ind., 420 N.E.2d 883. We held that the instruction in *White* was defective because it referred to subsidiary

*evidence*, not subsidiary facts. *Ringham, supra.* The instruction is a correct statement of the law and it was not error to read it over the defendant's objection.

## VII

The State offered both a closing argument and rebuttal during the penalty phase of the defendant's trial. The defendant argues that the prosecution used inflammatory and prejudicial language during this segment of the trial and feels that he was denied due process of law. Most of the argument is directed to remarks made by Deputy Prosecutor Garrison during the rebuttal but there is also one allegation of misconduct by Deputy Prosecutor Tinder during the closing argument. The defendant did not object to any of the remarks that were made.

■■■ *Maldonado v. State*, (1976) 265 Ind. 492, 355 N.E.2d 843, is the leading case on prosecutorial misconduct. The following factors are to be considered when reviewing a charge of prosecutorial misconduct:

1. The Court first determines that the prosecutor in fact engaged in misconduct. This determination is made by reference to the case law and the disciplinary rules of the Code of Professional Responsibility as adopted in this State. See *Swope v. State*, (1975) 263 Ind. 148, 325 N.E.2d 193.

2. The Court then considers whether the misconduct, under all the circumstances, "placed [the defendant] in a position of grave peril to which he should not have been subjected." *White v. State*, (1971) 257 Ind. 64, 78, 272 N.E.2d 312, 320, followed in *Warner v. State*, (1976) 265 Ind. 262, 354 N.E.2d 178, 54 Ind.Dec. 481; *Rufer v. State*, (1976) 264 Ind. 258, 342 N.E.2d 856; *Turczi v. State*, (1973) 261 Ind. 273, 301 N.E.2d 752; *Robinson v. State*, (1973) 260 Ind. 517, 297 N.E.2d 409. The "grave peril" standard does not require the Court to find that the misconduct determined the outcome of the trial. *White, supra,* at

272 N.E.2d 319–20. This is the same standard which *White* mandates trial courts to observe in ruling on mistrial motions.

 3. Whether the misconduct results in subjecting the defendant to "grave peril" is determined by the probable persuasive effect of the misconduct on the jury's decision, not by the degree of impropriety of the conduct. *Swope v. State, supra.*

 4. Even if an isolated instance of misconduct does not establish grave peril, if repeated instances evidence a deliberate attempt to improperly prejudice the defendant, a reversal may still result. *Robinson v. State,* (1973) 260 Ind. 517, 297 N.E.2d 409; *Garrett v. State,* (1974) 157 Ind.App. 426, 300 N.E.2d 696.

*Id.* 265 Ind. at 498–99, 355 N.E.2d at 848. *Maldonado* also held that this Court prefers "to decide issues on their merits, and not to erect procedural obstacles to their presentation. However, a prompt objection affords the trial court an opportunity to prevent or remedy prejudice to a defendant without the considerable waste of time and resources involved in the reversal of a conviction, and for this reason a contemporaneous objection is required as a condition to appellate review." *Id.* In the present case there were no objections made, and the whole issue is waived.

 ■ Assuming, *arguendo,* that this argument has not been waived, we will examine the defendant's allegations. First, the defendant alleges that Mr. Tinder minimized the jury's role by reminding the jury that the trial court imposes the sentence. Mr. Tinder's remarks are as follows:

"We've reached the stage in the trial when you've received all of the evidence and within a few minutes you will have heard all of the argument, and then it becomes your decision with regard to a recommendation to be made to the Judge. And I have to emphasize that, as it was asked in voir dire, and as you have been instructed, you are to make a recommendation to the Judge. The Judge has an additional opportunity to review

this matter and he will make the final decision. Now, the issue upon which you must make your recommendation is with regard to the Information that I read to you: Did Gary Burris intentionally kill Kenny Chambers during the commission of a robbery?

Defendant argues that Mr. Garrison re-emphasized the jury's minimal role by saying, "When you all go back in that jury room and say, well, gee, John Tranberg is not going to let him walk out—I'm going to quit—you are justice." Burris feels that this alone is sufficient for reversal and he cites three South Carolina cases in support of his argument.

 We do not feel that Mr. Tinder's initial remarks or Mr. Garrison's remarks in rebuttal minimized the jury's role in the penalty phase of the proceedings. Mr. Tinder stated the law as found in Ind.Code § 35–50–2–9(e). The jury makes a recommendation of life or death and the trial court ultimately decides the fate of the defendant. But Mr. Tinder did not attempt to encourage the jurors to neglect their duty. In fact, he reminded them of the oath they took before trial to "well and truly try this case." Mr. Tinder told them to set aside their personal feelings and biases and reach a decision based upon the evidence presented before them. He presented the evidence, pointed out the aggravating circumstance, and said they would have to weigh any mitigating circumstances against it.

 As for Mr. Garrison's remarks, the defendant took the sentence out of context. When read in context his remark is a plea to the jurors not to evade or minimize their role by assuming that if they recommend life, the trial court will overrule them and not "let him [the defendant] walk out." The next sentence, which the defendant omitted from the appellate brief, reads: "And you owe it, if you believe the evidence, not to step aside from that duty." The quoted language is the conclusion of a passage which emphasizes the jury's vital role in the system designed to promote the American ideal of equal justice under the

law. Neither deputy prosecutor attempted to minimize the jury's role in deciding whether to recommend the death penalty.

■■■■ The defendant argues that Mr. Garrison's rebuttal was calculated to inflame the passions and prejudices of the jury. In particular, defendant Burris claims that the deputy prosecutor stated he had personal knowledge regarding why the death penalty was charged, and that he told the jury that Burris should be used as an example for the rest of the community. We agree with the State that although the closing remarks were tough, they did not place the defendant in such grave peril that his death sentence should be removed. It is improper for counsel to imply that he has superior or inside knowledge of a case by way of asking for a jury verdict. *Kocher v. State,* (1979) 270 Ind. 661, 389 N.E.2d 18. After reviewing the closing remarks, it does not appear that Mr. Garrison implied that the prosecutor's decision to seek the death penalty was based on inside knowledge. In fact, he stated that the decision to seek the death penalty was based upon evidence that the victim was executed with no cause. The justification for the death penalty was found in the evidence that had already been presented to the jury. It also appears that the whole rebuttal was in response to the defendant's closing remarks. The defendant charged the prosecutor with "freakish application" of the death penalty because the accomplices had not faced a penalty of death. Mr. Garrison, in rebuttal, went over the evidence that eventually led to the decision to seek a sentence of death. When viewed as a whole, the argument was not intended, nor could it reasonably have been taken, as an implication of special knowledge. *Merritte v. State,* (1982) Ind., 438 N.E.2d 754. Besides, the State "is entitled to respond to allegations and inferences made by defense counsel, even when such arguments by the prosecutor might otherwise be objectionable." *Marshall v. State,* (1982) Ind., 438 N.E.2d 986, 989.

## VIII

Defendant Burris argues that the instructions given to the jury during the penalty phase were fatally defective in the following respects:

A. The jury was not instructed concerning the range of penalties to which the defendant was subjected if the jury recommended against the death penalty.

B. The jury was not instructed that it had the power to reject the death penalty, and also that it was erroneously instructed that it could recommend the death penalty even if the State failed to prove the aggravating circumstance beyond a reasonable doubt.

C. The instructions allowed the jury to consider evidence of aggravation without clear guidance that only the alleged statutory aggravating factor can be considered.

The defendant also argues that the jury should return written findings when recommending a penalty of death.

### A

■■■ The defendant points to *Brewer v. State,* (1981) Ind., 417 N.E.2d 889, in support of his argument that the jury should be told of the range of penalties to which he would be subject if the jury recommended life imprisonment. In *Brewer,* the jury interrupted its deliberations during the penalty phase and asked the trial court if the defendant would be eligible for parole should a life sentence be imposed. The trial court informed the jury that there was no longer any provision in the statutes for life sentences and then went on to explain the possible penalties the defendant could face if he was not sentenced to death. This Court noted that although we disapprove of instructions "that invite or tempt the jury to consider the ultimate sentence likely to be served, *Feggins v. State,* (1977) 265 Ind. 674, 359 N.E.2d 517; *Inman v. State,* (1979) [271] Ind. [491], 393 N.E.2d 767" we did not find fault in *Brewer* because the guilt determination had been made and we thought it proper that the jury be made aware of the possible prison sentences. 417 N.E.2d at 909.

The defendant argues that *Brewer* compels trial courts to instruct juries about the possible penalties a defendant faces should they decide to return a recommendation of life. Failing this, the death penalty should be overturned. We disagree. To endorse this issue as a whole in *Brewer* is not to say that anything different is unacceptable. *Brewer* dealt with a situation where there was a specific request for this information by the jury and it had been agreed to by the defense counsel. Here there was no request by the jury for such information. We cannot speculate that the jury was unable to reach a relevant recommendation absent this information and the defendant does not show how he was prejudiced by this omission.

### B

The defendant contends that the jury was not properly informed about its right to reject or recommend the death penalty. The following instruction was given to the jury before it began deliberations:

If after a consideration of all the evidence herein, you and each of you are convinced thereby beyond a reasonable doubt that defendant Gary Burris on January 29, 1980, did intentionally kill Kenneth W. Chambers with a handgun while defendant was committing the crime of robbery and if you are further convinced by the evidence beyond a reasonable doubt that any mitigating circumstances that existed are outweighed by the foregoing aggravating circumstances, the form of your recommendation may be:

"We, the Jury, recommend the defendant GARY BURRIS shall suffer the death penalty as provided by law."

If, after consideration of all the evidence herein, you and each of you entertain a reasonable doubt as to the aggravating circumstances alleged by the State, or if you are convinced that any mitigating circumstances outweigh such aggravating circumstances, then the form of your recommendation may be:

"We, the Jury, do not recommend that defendant GARY BURRIS shall suffer the death penalty."

You will now again retire to the jury room where the foreman you have already selected shall preside over your further deliberations and when you have decided upon a recommendation, will sign and date the same and return it into open court.

The first part of the instruction allows the jury to decide whether or not to recommend a penalty of death and is correct. We recognize that the second to the last paragraph is in error. That paragraph should read as follows:

If, after consideration of all the evidence herein, you and each of you entertain a reasonable doubt as to the aggravating circumstances alleged by the State, or if you are convinced that any mitigating circumstances outweigh such aggravating circumstances, then the form of your recommendation *shall* be:

"We, the Jury do not recommend that defendant GARY BURRIS shall suffer the death penalty."

The defendant claims that the jury was misled into recommending the death penalty no matter what situation occurred.

▆▆▆ If the jury does not find the aggravating circumstances to have been proved beyond a reasonable doubt, or that it is outweighed by mitigating circumstances, the jury has only one choice: no recommendation of death. The trial court had this in mind because the form of the recommendation following the erroneous use of the verb "to be" states that the defendant shall not suffer the penalty of death. The jury was also instructed, through the preliminary instructions, that the State must prove the aggravating circumstance beyond a reasonable doubt when seeking the death penalty. The jury was made aware of the standard of proof that is required before a sentence of death may be imposed. Although the instruction incorrectly states the law, there does not appear to be any prejudice shown. In addition, counsel for the defendant did not ob-

ject to the instruction at trial. A failure to object will waive appellate consideration of an error concerning the giving of instructions. *Minneman v. State*, (1982) Ind., 441 N.E.2d 673. The defendant has not shown any prejudice or harm from this instruction.

### C

The defendant argues next that the instructions allowed the jury to consider evidence of aggravation without clear guidance that only the alleged statutory aggravating factor can be considered. Under Ind.Code § 35–50–2–9(b), only the following aggravating circumstances may be considered when seeking the death penalty:

(1) The defendant committed the murder by intentionally killing the victim while committing or attempting to commit arson, burglary, child molesting, criminal deviate conduct, kidnapping, rape, or robbery.

(2) The defendant committed the murder by the unlawful detonation of an explosive with intent to injure person or damage property.

(3) The defendant committed the murder by lying in wait.

(4) The defendant who committed the murder was hired to kill.

(5) The defendant committed the murder by hiring another person to kill.

(6) The victim of the murder was a corrections employee, fireman, judge, or law-enforcement officer, and either (i) the victim was acting in the course of duty or (ii) the murder was motivated by an act the victim performed while acting in the course of duty.

(7) The defendant has been convicted of another murder.

(8) The defendant has committed another murder, at any time, regardless of whether he has been convicted of that other murder.

(9) The defendant was under a sentence of life imprisonment at the time of the murder.

The State used the aggravating factor found in paragraph (1) to seek the death penalty. The jury was informed in Final Instruction No. 1 that before a recommendation of death could be returned, it first must find beyond a reasonable doubt, that the defendant intentionally killed Kenneth W. Chambers while the defendant was committing a robbery. Intentional killing during the commission of specified felonies is the first aggravating factor listed under 35–50–2–9(b). Preliminary Instruction No. 1 also stated that the intentional murder during the course of robbery was the aggravating circumstance, and the same was true in Preliminary Instruction No. 3. Preliminary Instruction No. 5 defined "intentionally." The jury was adequately instructed about the aggravating factor that needed to be proved before a recommendation of death could be returned.

The defendant also argues that the lack of written jury findings makes Indiana's death penalty statute unconstitutional. Our death penalty statute was based upon the Florida statute that was upheld by the United States Supreme Court in *Proffitt v. Florida*, (1976) 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913. We have compared the statutes many times and have held that Indiana's statute imposes stricter guidelines on the jury, thereby resulting in a more restrictive application of the death penalty. *Schiro v. State*, (1983) Ind., 451 N.E.2d 1047, *cert. denied*, —— U.S. ——, 104 S.Ct. 510, 78 L.Ed.2d 699. We also require the trial court to supply us with written findings concerning the imposition of the death penalty. "This will guard against the influence of improper factors at the trial level and will make sure the evils of *Furman v. Georgia*, (1972) 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346, 'arbitrary and capricious application' of the death penalty were not present in the sentencing decision." *Schiro, supra*, 451 N.E.2d at 1053. We do not feel that the jury must return written findings when returning its recommendation.

### IX

The defendant argues that the trial court erred in imposing the death penalty

without a specific jury determination that the defendant had been convicted of murder as a principal. The Information charging the defendant with felony murder also charged Merriweather and Thompson with the crime. The jury was instructed about accomplice liability during the guilt phase of the trial. The following verdict was returned:

"We, the Jury, find the defendant GARY BURRIS guilty of the crime of Murder, as charged in the Information."

Defendant Burris argues that the verdict does not show if the jury found him to be guilty as a principal or as an accomplice to murder, and thus he cannot be sentenced to death.

A similar issue was presented in *Resnover v. State*, (1984) Ind., 460 N.E.2d 922. Defendant Resnover argued that *Enmund v. Florida*, (1982) 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140, precluded his execution for the murder of Jack Ohrberg because he was not a "trigger man." We interpreted *Enmund* as follows:

Enmund therefore dictates the rule that although vicarious liability for crimes perpetrated by one's confederates can justify one's convictions for said crimes, the imposition of death upon a vicariously guilty defendant must be based on "*his* culpability, not on that of those who committed the robbery and shot the victims, for [the United States Supreme Court] insist[s] on 'individualized consideration as a constitutional requirement in imposing the death sentence.'" *Enmund*, 458 U.S. at 798, 102 S.Ct. at 3377, 73 L.Ed.2d at 1152 (quoting *Lockett v. Ohio*, (1978) 438 U.S. 586, 605, 98 S.Ct. 2954, 2965, 57 L.Ed.2d 973, 990); *See also Woodson [v. North Carolina*, (1976), 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed.2d 944], *supra.* The *Enmund* court specified that "For purposes of imposing the death penalty, [the defendant's] ... punishment must be tailored to his personal responsibility and moral guilt." *Enmund*, 458 U.S. at 801, 102 S.Ct. at 3378, 73 L.Ed.2d at 1154.

We do not find that the death penalty cannot be applied to defendant Burris. The defendant directly participated in the robbery and murder of Kenneth Chambers "such that his personal responsibility and moral guilt are very apparent." *Resnover, supra.* In addition, evidence was presented to show that defendant Burris did indeed fire the fatal shot. Carol Wilkins testified that Burris put a .38 pistol in his pocket on the night of the murder and when he returned he had a large sum of money. Wilkins watched the defendant burn a run sheet that in all probability came from the victim's cab. The murder weapon was later found inside a stereo speaker in the apartment where the defendant was arrested. William Kirby testified that the defendant came up with the plan to rob a taxi cab driver and that Burris informed his accomplices that he was willing to kill in order to stay out of jail. Kirby also testified that Burris was the one who forced the victim to lie down on the ground and that he fired the fatal shot. There is no merit to the defendant's argument that under *Enmund, supra,* the death penalty could not be applied to him.

## X

The defendant next contends that any meaningful appellate review must embody proportionality review. The defendant argues that proportionality review eliminates the random and arbitrary application of the death penalty by providing a check on the trial court's or jury's discretion.

We have disposed of this issue concerning meaningful appellate review on numerous occasions and will not go into it again at great length in this opinion. *See Schiro v. State*, (1983) Ind., 451 N.E.2d 1047, *cert. denied*, —— U.S. ——, 104 S.Ct. 510, 78 L.Ed.2d 699; *see also Resnover v. State*, (1984) Ind., 460 N.E.2d 922; *Williams v. State*, (1982) Ind., 430 N.E.2d 759, *appeal dismissed*, 459 U.S. 808, 103 S.Ct. 33, 74 L.Ed.2d 47; *Brewer v. State*, (1981) Ind., 417 N.E.2d 889, *cert. denied*, 458 U.S. 1122, 102 S.Ct. 3510, 73 L.Ed.2d 1384. We have consistently held that because of procedure

mandated by statute, codified by rules, and controlled by cited precedent, "this Court can then meaningfully and systematically review each case in which capital punishment has been chosen, in light of other death penalty cases." *Judy v. State*, (1981) Ind., 416 N.E.2d 95, 108.

The defendant would still argue that under *Proffitt v. Florida, supra*, issue VIII(C), the United States Supreme Court has interpreted the Constitution to require proportionality review to check the capricious application of capital punishment. The United States Supreme Court recently handed down *Pulley v. Harris*, (1984) —— U.S. ——, 104 S.Ct. 871, 79 L.Ed.2d 29, in which that Court held that the Eighth Amendment to the United States Constitution does not require a state appellate court "to compare the sentence in the case before it with the penalties imposed in similar cases if requested to do so by the prisoner." *Id.* at ——, 104 S.Ct. at 876, 79 L.Ed.2d at 36. The Court in *Pulley* focused on the statutes governing review of death sentences in California and quoted the California Supreme Court in *People v. Frierson*, (1979) 25 Cal.3rd 142, 179, 158 Cal.Rptr. 281, 302, 599 P.2d 587, 609:

> "[T]he statutory requirements that the jury specify the special circumstances which permit imposition of the death penalty, and that the trial judge specify his reasons for denying modification of the death penalty, serve to assure thoughtful and effective appellate review, focusing upon the circumstances present in each particular case."

In Indiana, we require the trial court to supply this Court with its written findings indicating the aggravating factors it found to be present in imposing a sentence of death. We review those findings, along with the sentencing hearing and the entire transcript. Thus, we still adhere to our position that the appellate review that automatically follows the imposition of the death sentence fully satisfies the requirements imposed by the United States Supreme Court in *Gregg v. Georgia* (1976) 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 and

*Proffitt v. Florida* and does not violate the Eighth and Fourteenth Amendments to the Constitution of the United States.

## XI

The defendant next contends that he was denied adequate representation of counsel. Burris raises four instances of alleged error, concerning: the inducements offered to William Kirby in exchange for his testimony; the testimony of Carol Wilkins about the defendant's participation in a separate robbery; defense counsel's failure to request jury sequestration; and defense counsel's failure to challenge the death qualification of the jury or rehabilitate those jurors excused for cause.

We are guided by well-settled rules in our review of this contention. An attorney is presumed to have rendered competent representation, and only a strong showing to the contrary will rebut that presumption. *E.g., Robertson v. State*, (1974) 262 Ind. 562, 319 N.E.2d 833. We must look to the facts of each case in order to determine whether counsel has provided his client with effective representation. *E.g., Roberts v. State*, (1977) 266 Ind. 72, 360 N.E.2d 825. We will not second-guess counsel's trial tactics or strategy. *E.g., Loman v. State*, (1976) 265 Ind. 255, 354 N.E.2d 205. An isolated mistake or instance of poor strategy does not render representation ineffective or inadequate; and representation is deemed to be adequate, unless the record reflects that the trial was reduced to a mockery of justice. *E.g., Merida v. State*, (1979) [270] Ind. [218], 383 N.E.2d 1043.

*Nelson v. State*, (1980) 272 Ind. 692, 696, 401 N.E.2d 666, 669. The defendant contends that this standard of review does not conform with a "universally conceded" view in death penalty cases, but we applied this standard in a recent death penalty case. *Brewer, supra,* and see no reason why we should depart from this standard now.

■ With regard to the claim that defense counsel failed to move for jury se-

questration, we are not informed of how the defendant was harmed by that action. He does not allege that his trial was prejudiced thereby; he merely argues that he had the right to have the jury sequestered. As for the claims concerning the inducements offered to William Kirby and the failure to challenge the jury, we decided in issues I and IV that no error had been committed. Thus, we fail to see how the presumption of competency has been rebutted on the above three issues.

█ The defendant's final claim of incompetency deals with Carol Wilkins' testimony. Wilkins testified that on the night of the murder, the defendant left the apartment but later returned, claiming that he had "stuck up" someone. When asked what he took during the alleged robbery, Carol Wilkins replied that he returned with a .38 pistol. This so-called robbery took place before the murder of Kenneth Chambers. Defendant Burris claims that the evidence was prejudicial because the jury would be more prone to believe the defendant was involved in the murder if he had committed a prior robbery.

This indication of incompetence appears to have been a tactical decision by defense counsel not to strike the answer or cross-examine Wilkins. A perusal of the record indicates that the questioning may have been used to have Wilkins identify the murder weapon in the defendant's possession prior to the murder. The prosecution did not pursue the issue of a separate robbery and Wilkins' comment about the robbery was made in passing and in the context of her recognition of the gun. An objection might have drawn more attention to the other alleged robbery. Regardless, this alleged error does not rebut the strong presumption of defense counsel's competency and the defendant is not entitled to a new trial.

### XII

Finally, we now examine whether the death sentence is appropriate in the defendant's case. Defendant Burris argues that the evidence is insufficient to prove the

aggravating circumstances beyond a reasonable doubt. He claims that Kirby's testimony is unreliable and suspect and thus he should not be sentenced to death. This Court neither weighs the evidence nor judges the credibility of witnesses but will look only to the evidence most favorable to the State with all reasonable inferences that may be drawn therefrom. *Everroad v. State*, (1982) Ind., 442 N.E.2d 994. We have already decided that Kirby's testimony was properly introduced at trial and thus was sufficient to show the defendant intentionally killed Kenneth Chambers.

█ The trial court made written findings pursuant to Ind.Code § 35–50–2–9 to facilitate our review of the sentence of death. The trial court noted that the jury, in a bifurcated hearing, recommended the penalty of death after considering evidence at both the trial stage and the penalty phase. The trial court specifically found that the State of Indiana proved beyond a reasonable doubt that Gary Burris committed murder by intentionally killing Kenneth Chambers while committing robbery. According to the facts presented earlier in this opinion, we now find that the trial court was justified in finding this aggravating circumstance. Kenneth Chambers was killed during the commission of a robbery. Thelma Williams testified that she telephoned Chamber's cab company at the request of Burris. Burris and his two companions took the cab when it arrived at the lounge where Williams worked. Burris returned to his apartment on the morning of the murder with bulging wads of money and a cab driver's run sheet, although earlier Burris was upset over his inability to pay rent and utility bills. The manner of Chambers' death indicates the murder was intentional. Chambers was told to strip, then was forced out of the cab where his hands were bound and he was ordered to lie down on the freezing ground. Chambers pleaded for mercy but Burris placed the pistol against Chambers' head and pulled the trigger, thereby killing him. An expert witness testified that the pull of the trigger made it a little harder to shoot than

an average weapon and the gun had no propensity to discharge. Burris had mentioned earlier that he was willing to murder in order to stay out of jail.

As for the mitigating factors, the trial court found that they were not outweighed by the aggravating factors. The court was supplied with a pre-sentence report and a psychiatric evaluation of the defendant. The two psychiatrists labeled Burris as a "sociopathic personality" and stated that there were no indications of mental illness or deficiency. The trial court noted that there was no showing that the defendant's capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was substantially impaired as a result of intoxication. The trial court further found that other mitigating factors to the effect that the accomplices could have committed the murder, and the defendant's argument that his acts were insufficient to warrant death, were without merit.

Thus, the cold-blooded nature of this murder, the character of the offender, and the compliance of the trial court with Ind. Code § 35–50–2–9, lead us to conclude that the death penalty was not arbitrarily or capriciously applied, and is reasonable and appropriate. This cause is remanded to the trial court for the purpose of setting a date for the death sentence to be carried out.

GIVAN, C.J., and DeBRULER and HUNTER, JJ., concur.

PRENTICE, J., concurs in result.