Gregory VAN CLEAVE, Appellant
(Defendant Below),

v.

STATE of Indiana, Appellee
(Plaintiff Below).

No. 384S109.

Supreme Court of Indiana.

Dec. 30, 1987.

Richard Kammen, McClure, McClure & Kammen, Indianapolis, Daniel Dovenbarger, Instructor of Law, Indiana University, Indianapolis School of Law, Indianapolis, for appellant.

Linley E. Pearson, Atty. Gen., Joseph N. Stevenson, Deputy Atty. Gen., Indianapolis, for appellee.

SHEPARD, Chief Justice.

Appellant Gregory Van Cleave pled guilty to murder, Ind.Code § 35–42–1–1 (Burns 1985 Repl.), and was sentenced to death. Ind.Code § 35–50–2–9 (Burns 1985 Repl.). This direct appeal presents the following issues:

1) Whether appellant was denied a fair sentencing hearing when the State impeached his testimony with the substance of a prior clean-up statement which had been withheld from the defense in violation of discovery orders;

2) Whether the clean-up statement was involuntarily made and should not have been admitted;

3) Whether the State engaged in improper cross-examination when it questioned appellant about the prior burglaries to which he confessed in the clean-up statement;

4) Whether the court erred by denying in part appellant's motion for discovery;

5) Whether the prosecutor committed misconduct by interfering with appellant's preparation for the sentencing;

6) Whether Van Cleave received effective assistance of counsel;

7) Whether Indiana's death penalty is unconstitutional for its alleged lack of proportionality review and because it is allegedly discriminatorily applied against blacks who kill whites, and

8) Whether the court erred in imposing the death sentence.

Because the determination of a number of these issues requires a thorough understanding of the evidence presented at the sentencing hearing, we present the facts at some length.

On the evening of October 19, 1982, Robert Falkner was working outside his Indianapolis home when he was shot and killed. He had been caulking a window by floodlight while watching the World Series on a television he had set up outside. He was shot in the chest with a shotgun.

Four days later, Gregory Van Cleave, James Brazelton, Robert Coleman, and Andrew Sims were arrested for the crime. Each gave a statement to the police. Appellant had fired the shot which killed Falkner; he was charged with murder and with conspiracy to commit robbery. The State filed an information for the death sentence alleging as an aggravating factor that Van Cleave intentionally killed Falkner while attempting to commit robbery.

Van Cleave and the State entered into a plea agreement by which the State agreed to forego prosecution on count I, conspiracy to commit robbery, in exchange for Van Cleave's plea of guilty to felony murder. The parties agreed that at the sentencing hearing the State would present evidence on the death penalty count that the killing was intentional. The agreement provided that, in the event the court did not impose the death sentence, Van Cleave would be sentenced to sixty years in prison.

Pursuant to this agreement, Van Cleave pled guilty to felony murder, admitting that he killed Falkner while committing or attempting to commit a robbery.

*State's presentation in favor of the death sentence.* At the sentencing hearing, State's witness Gail Schwarz testified that he was house-sitting for the Falkner's neighbors on the night Falkner was killed. Schwarz was walking near the Falkner house when he saw Falkner stand straight up in front of two other figures and say, "What do you mean, 'shut up'?" One of the figures raised his arm, and Schwarz saw a blue flash. Falkner fell, and the two individuals fled. Schwarz stated that Falkner did not move toward the two figures before he was shot.

Both Coleman and Brazelton entered into plea agreements with the State and testified against Van Cleave. They testified that on the afternoon of the murder, Coleman, Van Cleave, Brazelton and Sims were present in the parking lot of Crispus Attucks High School, from which appellant had been expelled. According to Coleman, appellant had an altercation there that day with one James Buchanan and had stated that he was going to "pop" him. Both witnesses testified that Van Cleave had a gun with him and was looking for revenge against Buchanan.

About 7 p.m. that evening, the four started driving around in Coleman's car "getting high and stuff." They bought some liquor and drove to Watkins Park and smoked marijuana. Brazelton testified that when they were in Watkins Park, appellant had two shells with him, and he broke open the gun. When Van Cleave finished with the gun and placed it under the arm rest, Brazelton saw only one shell in Van Cleave's possession. The prosecutor read from Brazelton's statement to detectives in which he said more specifically that Van Cleave had two shells, "one in his pocket and one in the gun."

Later they purchased more liquor and continued to drive around with Coleman and Brazelton in the front seat and appellant and Sims in the back. They discussed ways of making some money. Brazelton said they agreed to rob someone. They drove near the Falkner house and, according to Coleman, spotted Falkner. Sims and Van Cleave "hollered" to let them out of the car. Sims and appellant left the car, with the appellant in possession of the shotgun. Coleman parked on Delaware Street; he heard someone say "shut up," then "What do you mean, 'shut up'?", and then he heard two gun shots. The second shot was from Sims' handgun, which he fired into the air.

Van Cleave and Sims ran back to the car and Coleman drove away. He asked what had happened, and appellant said he had shot a man. When asked why, appellant responded, "because he (Falkner) was hollering" and because he reached for him. They drove to another liquor store and then to Sims' house where Van Cleave continued to discuss seeking revenge against James Buchanan.

Although Brazelton had told detectives that Van Cleave bought the shotgun and had it sawed off, he testified at the hearing that the gun belonged to Sims, who had bought the gun because his apartment had been burglarized. Sims and Brazelton later gave the gun to a man who turned it over to detectives.

On cross-examination, Coleman admitted that the night he was arrested he told the police that Van Cleave appeared stunned after shooting Falkner and that he believed appellant's finger had been on the trigger and the gun "just went off." Brazelton admitted that he had once reported that appellant seemed stunned and surprised after the shooting and that Brazelton felt Van Cleave fired because he was nervous. Each said that Van Cleave and Sims told them Falkner made a move toward them. Van Cleave told them at one point that the shooting was accidental.

Paul Koss testified for the State that the shotgun used to kill Falkner is a single action weapon. To discharge such a weapon, one must first pull the hammer back to the cocked position and then pull the trigger. Sixteen pounds of pressure are needed to pull the hammer back; it requires six pounds to pull the trigger. He said that

residue tests indicated the weapon was six to eight feet from Falkner when fired. On cross-examination he said his tests on the gun would not reveal how long before firing the hammer had been pulled, and that, once the hammer was pulled back, a sudden jerking motion could cause the gun to discharge.

State's witness William Mundy was the groundskeeper of the apartment complex where Sims lived. He testified that the morning after the murder he overheard a conversation among Van Cleave, Sims, and Brazelton. He heard Brazelton say, "Well, man, you didn't have to shoot him," and Sims said, "Yeah, man, when you did that something—felt like something strange just ran all through me." Then Van Cleave said, "Yeah, man, that's just what happens when [sic] don't want to give up those ends." "Ends," Mundy stated, is street slang for "money."

Detective Robert Green testified he assisted the prosecutor in an attempt to reconstruct the crime. They concluded that Falkner was shot from a distance of seven feet. On cross-examination, Green said that he had investigated numerous felony murders and that, in his opinion, Van Cleave shot Falkner out of panic. Green stated that he had known the Van Cleave family, but that his acquaintance was not a factor in his opinion that appellant panicked.

*Van Cleave's presentation against the death sentence.* Tyra Phipps, a psychologist and vocational counselor, administered a Minnesota Multiphasic Personality Inventory to appellant. She testified that Van Cleave should be an excellent candidate for vocational rehabilitation. He had a wide range of interests and would "learn and grow" in the jail environment.

Appellant's mother, Pauline Van Cleave, testified that appellant was an honor roll student in junior high school but began to have trouble with the law about the time she and his father were divorced. After his expulsion from Attucks, he enlisted in the Army, but was honorably discharged after three months. After his discharge, Van Cleave worked at a few odd jobs.

The day appellant was arrested he approached his mother and said he had to talk to her. He said, "Momma, I got to tell you something and its going to kill you. I killed a man." He said, "It was an accident. I panicked." Van Cleave told his mother they intended to steal Falkner's television.

Appellant testified at the sentencing hearing. His attorney reminded him of his right not to testify and said, "Do you also understand ... that anything you have in your background can be used against you today?" It proved to be a prophetic question.

Appellant testified about the day of the murder. He said he did have a fight with Buchanan approximately three weeks before the night he shot Falkner, but he denied any altercation with Buchanan on that day. Buchanan testified and confirmed appellant's statement. Furthermore, Van Cleave stated he did not have a gun with him when he met his friends near Attucks. He said he and his three friends went to Sims' apartment, where he first saw the shotgun. After they drove around and drank some liquor, they went back for the shotgun. Appellant said Sims carried it to the car and put it in the trunk. He said they never went to Watkins Park, and he did not open and close the gun as Brazelton had previously testified. Van Cleave also denied having shotgun shells with him that night.

They made a second trip to the liquor store and smoked some marijuana. Appellant said they did not discuss doing something to get money until they saw Falkner's television. They agreed to take it.

Van Cleave said Brazelton pushed the button in the glove compartment to open the trunk, and appellant took the shotgun from the trunk. Sims had the pistol with him. Appellant said they sneaked up to the house, planning to threaten Falkner with the guns. They presumed when he saw the guns he would give them the television.

Appellant stated he did not know if the shotgun was loaded or if it was cocked. He did not remember cocking the gun.

When they approached Falkner, Van Cleave stated he already had the gun raised with his finger on the trigger and that he kept looking over his shoulder. He said he was "high" and scared.

Appellant said that Falkner said, "What do you want." Sims said "Shut-up," and Falkner said, "What do you mean, 'shut-up'?" Then appellant said "Shut-up." He turned to look over his shoulder. When he turned back, Falkner made a quick move. Van Cleave jerked back, and the gun discharged. Appellant stated he was three to five feet from Falkner. When asked if he killed Falkner, Van Cleave replied, "Well, it happened so fast. Before I realized what had happened the gun had discharged."

Van Cleave testified that when he returned to the car after the shooting and was asked what happened, he said he did not know. He said the gun had gone off and he thought he shot Falkner. He denied telling his friends that he shot Falkner because he would not shut up or give them any money.

They bought more liquor and drove to Coleman's girlfriend's house. Appellant said he was not at Sims' apartment the next morning when the groundskeeper reportedly overheard the incriminating conversation. He met with Sims and Coleman the day before his arrest and told them the killing was an accident.

On cross-examination, Van Cleave again admitted he shot Falkner but stated he did not remember pulling the trigger. Appellant stated he pointed the gun at Falkner when he first confronted him. He testified that Falkner made some sort of move, variously described as a lunge or a step, but he admitted Falkner did not try to grab the gun, contrary to what he had told detectives. Although Van Cleave insisted the shotgun was in the trunk until they arrived at Falkner's house, he had told detectives that it was in the car as they rode around town. He claims he does not remember cocking the gun when he approached Falkner, but he admitted on cross-examination he would not be likely to ride in a car with a cocked shotgun. Appellant insisted, however, that he did not know the gun was

cocked and never had the conscious thought, "I'm going to shoot him."

The prosecutor reminded Van Cleave of two post-arrest interviews with the media. First, he had said in a radio interview that the gun had a hair trigger. Second, he gave a television interview which he ended with a wink at the camera and a strut.

Van Cleave testified about his juvenile record, which included a theft charge in January 1978, and charges of criminal mischief and resisting a police officer in July 1978. In spring of 1980, he was expelled from Attucks for hitting a teacher, and in July 1980, he was arrested for non-payment of a parking ticket. In October 1980, Van Cleave received a theft conviction arising from charges of theft, battery and malicious trespass. He was placed on probation and two months later received another theft conviction arising from theft charges. He was released on his own recognizance in February 1981 and was arrested in March for burglary. He was convicted of the burglary and received a two-year sentence. Paroled in March 1982, he was arrested in September 1982 for possession of marijuana. Appellant was out on bond when he killed Falkner.

Van Cleave's attorney asked him about a disturbance at the Marion County Jail which occurred the week before the hearing. His attorney mentioned that the appellant's cell block "got trashed pretty good," and appellant denied doing any of the damage. He had been accused of possessing a propane torch and a trustee's uniform. Van Cleave testified the items were not in his possession and that an initial charge of attempted escape was dropped and he was placed in "dead-lock" for possession of contraband.

Van Cleave said he had never fired a shotgun before the night Falkner was killed but admitted he was probably more familiar with guns than most people. He learned to fire M-16 rifles in the military, where he earned a marksman's medal.

During cross-examination, Van Cleave stated he had told the court about all the crimes he had committed. However, when prosecutor Stephen Goldsmith later began

to question him about specific burglaries, he volunteered that he had once confessed to twenty or twenty-five other burglaries. The admission was made as a "clean-up" statement, used by police to clear files in exchange for a promise not to charge the perpetrator. The State had not provided any information about Van Cleave's clean-up statement during discovery.

The prosecutor reviewed Van Cleave's criminal history with him as follows: A December 1977 arrest for trespassing, an arrest for theft, a July 1978 arrest for mischief and resisting arrest, a July 1980 arrest for operating without a license, the series of burglaries from the clean-up statement, a burglary conviction, an arrest for selling stolen merchandise, a December 1980 theft conviction and an arrest for possession of marijuana. Appellant also admitted he once sold a stolen revolver to a "fence."

Asked about the recent uprising at the jail, Van Cleave denied playing a major role and denied threats to kill police and sheriff's dogs; he said he did not fill buckets with water to "take care" of tear gas. He admitted he was charged administratively with possession of a hack saw, a torch, and a trustee's outfit. The prosecutor asked, "In fact, contrary to your testimony on direct, the sheriff's hearing procedure found you guilty of attempted escape, did they not?" Appellant said he was *charged* with attempted escape, but he believed he was found guilty of possession of contraband.

In its rebuttal, the State called James Tapp, a prisoner at the Marion County Jail who witnessed the disturbance. He stated Van Cleave wrapped towels around his arm to protect himself from the dogs, and that he poked at the lights with a broom stick, trying to break them. He had a bar of soap in a sock to use as a weapon. Tapp testified that appellant filled buckets of water and that he helped tie a door shut.

Mel Willsey, an investigator at the jail, testified about the disciplinary actions taken against appellant after the disturbance.

As custodian of the disciplinary records, he testified that Van Cleave pled guilty to attempted escape, threatening another, and possession of the following contraband: a torch, khakis, sheets, towels and blankets, and a hacksaw blade.

Finally, appellant testified on surrebuttal that he did not plead guilty to attempted escape. Both sides rested.

The court found that Van Cleave had admitted killing Robert Falkner while attempting to commit a robbery and that the State had demonstrated beyond a reasonable doubt that his act was intentional. She noted that Van Cleave had approached his victim with his finger on the trigger of a loaded weapon, one which would not fire unless the hammer was also pulled back. She determined that none of the specific statutory mitigating circumstances were present in Van Cleave's case but found that appellant's difficult home life and his failure to find work were mitigating factors. Finally, she found that the aggravating circumstances outweighed those in mitigation and sentenced Van Cleave to death.

## I. Effect of Discovery Violation

Apparently, the testimony about the clean-up statement came as a surprise to Van Cleave's attorney, who had not been told by his client or by the State that Van Cleave admitted to the burglaries. At the hearing on the motion to correct error, prosecutor Goldsmith testified that after Van Cleave pled guilty but before the sentencing hearing, his paralegal discovered Van Cleave's reference to the multiple burglaries in his confession to another burglary. Goldsmith asked her to determine whether guns had been stolen in these burglaries. She found an interdepartmental police memorandum listing ten of the burglaries by address and case number and indicating that guns had been stolen in the crimes. The clean-up statement itself was not found until after the sentencing hearing, so Van Cleave had been impeached with the information from the police memorandum.[1]

1. In the formal clean-up statement, Van Cleave

was asked, "Would you like now to clean up

Prosecutor Goldsmith testified that he decided the memorandum was not relevant to the State's case-in-chief and "that its applicability, if any, would be during the cross-examination or rebuttal, that is, coupled with the possible work product applications, were enough to me to decide on my own not to turn it over." Nevertheless, the court agreed with Van Cleave that the State's failure to disclose the information constituted a discovery violation. In denying appellant's motion to correct error, however, the court concluded he was not substantially prejudiced by the violation. The court stated in part:

It is, therefore, this court's opinion that the "clean-up" statement made by the defendant was covered by the Court's rules on discovery and should have been provided to the defendant prior to the sentencing hearing. The failure of the prosecutor to disclose this statement was a clear violation of this Court's rules on discovery.

It is necessary, therefore, to determine next whether the withholding of this information by the prosecutor so prejudiced the defendant that it is incumbent upon this court to set aside the defendant's plea of guilty, or in the alternative to set aside the death sentence and impose the plea bargained sixty (60) year sentence.

It is apparent from the testimony produced at the hearing on the Motion to Correct Errors that the State first learned of the defendant's "clean-up" statement shortly before the sentencing hearing, but after the defendant entered his plea of guilty to the murder charge. The State's failure to provide this statement, therefore, cannot have any bearing on the defendant's plea of guilty as the State cannot be charged with the responsibility of producing that which they do not have; nor would it be reasonable to presume the State knew or should have known of this statement prior to plea negotiations or prior to the actual taking of the defendant's guilty plea.

The State's failure to produce the defendant's "clean-up" statement is not an issue bearing on the defendant's plea of guilty to murder and the judgment of conviction as to the Murder charge must stand.

Was the defendant, however, prejudiced at the sentencing phase by this failure to disclose? The death sentence statute provides the State must prove beyond a reasonable doubt the existence of at least one of the aggravating factors alleged. The State did this. The defendant may produce additional evidence relevant to the alleged aggravating circumstances or any of the mitigating circumstances enumerated in the statute. The defendant submitted evidence. The statute further states the Court may only impose the death sentence if it finds that the State proved the aggravating circumstances beyond a reasonable doubt and that any mitigating circumstances that exist are outweighed by the aggravating circumstance.

The defendant testified as to his previous criminal conduct originating as a juvenile and including two felony convictions as an adult. The defendant also admitted that he was on bond for an arrest when this murder was committed, and that he had been in fact expelled from school for striking a teacher.

It was only on cross-examination by the Prosecutor that the defendant admitted to 25 burglaries contained in the "clean-up" statement which had not been disclosed to the defendant by the State. The question, then, is whether or not this information as presented by way of impeachment so harmed the defendant that this Court must set aside the death sentence and impose the bargained for 60 year sentence.

This question arises in the context of whether the State's failure to disclose this information so impaired the defendant's lawyer's ability to prepare for the hearing and to properly counsel his client so as to be a violation of the defendant's right to counsel. The answer to that

---

other burglaries you have been involved in knowing the fact that you will not be charged

with [sic]?", to which he responded with twelve addresses of residences he had burglarized.

question can only be answered in the negative.

The State could properly have presented the evidence of the defendant's prior criminal conduct during the State's portion of the evidence presentation, but chose not to do so. Even a motion *in limine* would not have been successful in keeping out this evidence at the sentencing hearing. (*Brewer v. State, supra*) Only when the defendant failed to be completely honest, did this statement come into evidence.

Presuming that evidence of the "clean-up" statement had not been presented to the Court at any stage of the hearing, there is sufficient evidence in the record to warrant a finding that the defendant had a significant history of prior criminal conduct and was, therefore, not a mitigating circumstance to be given great weight.

Van Cleave challenges the court's conclusion that he was not prejudiced by the violation. He claims it denied him his right to counsel because, unaware of the existence of a clean-up statement, his attorney was unable to prepare effectively for the sentencing hearing. He claims further that the discovery violation made impossible an intelligent waiver of his rights. He claims he would not have persisted in his plea of guilty had he known the evidence of the clean-up statement would be used. Van Cleave also claims his decision to waive his rights against self-incrimination and to testify was not knowing and voluntary without the knowledge that the State had the clean-up information. Finally, Van Cleave claims the State withheld exculpatory evidence when it failed to disclose the information.

■ The trial court is in the best position to determine the effect of violations of its discovery orders. This is all the more true where the hearing is to the bench alone. Therefore, it is afforded broad discretion in ruling on discovery matters, and this Court reverses its decisions only in cases of clear error. *Wallace v. State* (1985), Ind., 474 N.E.2d 1006. A discovery violation will generally not result in reversal unless prejudice has resulted.

■ The trial court did not err. Although the commission of the several burglaries added significantly to appellant's criminal history, the trial court stated that the additional information did not alter the final decision to impose the death sentence. The State had already proven to the satisfaction of the trial court the alleged aggravating factor—an intentional killing during an attempted robbery—and appellant's attempt to show in mitigation that he had no significant criminal history had already failed in light of other testimony about two felony convictions, several arrests, and the jail uprising.

■ The trial court correctly ruled that the State's violation did not deny Van Cleave his right to effective counsel. Appellant claims his attorney could not competently advise him about his decisions to plead guilty, waive a jury, and take the stand, while ignorant of the existence of the clean-up statement.

The prosecutor was not aware of the statement until after the plea was taken. If the information about the clean-up statement had been produced in discovery, its production would nonetheless have occurred *after* appellant's plea. Thus, the violation had no bearing on his decision to plead guilty and waive his right to trial by jury.

We disagree with appellant's statement that this case is on "all fours" with *Long v. State* (1982), Ind.App., 431 N.E.2d 875, in which the Court of Appeals held that the State's discovery violation did deprive Long of effective representation. There, the decision had been made for Long to take the stand. While testifying about his innocence, he was impeached with a confession he had made to that crime, a confession which the State had never produced in discovery.

■ One's decision to accept an attorney's advice to waive the Fifth Amendment and testify is never a counselled decision when the State lies in wait with a confession to the crime charged. Reversal is proper where the impact is prejudicial, as it

clearly was in *Long*. Here, the withheld evidence only added to the evidence which had already eliminated the possibility of proving an insignificant criminal history. Thus, its impact was not prejudicial and does not require a remedy on appeal.

Furthermore, Van Cleave's decision to testify could not have been significantly founded on his misunderstanding of the extent of the State's evidence about his criminal history. Strategically, it appears his only hope was to take the stand in an attempt to negate the State's evidence that the shooting was intentional. Counsel's preparation for the hearing was not rendered ineffective by the revelation of the burglaries.

■ Appellant asserted during the hearing on the motion to correct error that willful and blatant discovery violations were not at issue here. He now asserts this is a case of such gross intentional violation that an institutional remedy ought to be granted for its deterrent effect. We note that prosecutor Goldsmith testified under oath that he made a determination that the interdepartmental memorandum was not discoverable because it was to be used only as impeachment and because he believed it to be protected work product. This is not an appropriate case for an institutional remedy absent prejudice to appellant.

Appellant argues he was denied due process because, he claims, the State's discovery violation constituted withholding material evidence. He cites *United States v. Agurs*, 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976), and *Birkla v. State* (1975), 263 Ind. 37, 323 N.E.2d 645, in support of his claim. They stand for the proposition that grounds for reversal may exist where the State has withheld evidence material to guilt or punishment. Material evidence in that sense means evidence which creates a reasonable doubt which otherwise did not exist. *Agurs*, 427 U.S. at 112, 96 S.Ct. at 2402, 49 L.Ed.2d at 355. Here, the evidence of Van Cleave's several burglaries, which was ultimately revealed and was not withheld throughout the proceedings, was only cumulative of that which

was already shown—that appellant's criminal history was not insignificant.

■ Van Cleave states in his brief that this Court, "must consider whether or not a clean-up statement ... is exculpatory in the context of a death penalty hearing." He argues that the fact appellant once admitted to twenty-five burglaries shows his willingness to acknowledge guilt and indicates a punishment less than death is appropriate. Thus, he claims, the State was guilty of withholding exculpatory evidence.

While it is not entirely inconceivable that a sentencing judge might look favorably upon a defendant's past confessions, it is not the required point of view. A confession to twenty-five burglaries is certainly not "exculpatory" in its common sense. Furthermore, the evidence *was* ultimately revealed at trial, albeit after a discovery violation, and the appellant had the opportunity to try to convince the court the evidence was favorable to him. Appellant was not denied due process.

We discern no error in the court's determination that the discovery violation did not so prejudice Van Cleave that reversal is required.

Appellant raises for the first time on appeal an issue pertaining to the proceedings which followed the attempted escape from the jail. Van Cleave testified in court that he thought he had been found guilty of possession of contraband. Then, the custodian of the jail records testified from records he said he had with him that appellant pled guilty to attempted escape. During the hearing on the motion to correct error, the parties stipulated that a representative of the sheriff's department was present and, if called, would testify that the jail records purporting to show Van Cleave pled guilty to attempted escape could not be found after a diligent search. From this, appellant frames the issue as "whether or not the State ... improperly withheld ... a certain record allegedly documenting that appellant entered a plea of guilty to the offense of attempted escape and other administrative offenses."

Appellant lodged no complaint to the jail records keeper's testimony, and the records were never admitted into evidence. His allegation that the State withheld the records is unsupported by argument, citation to authority, or factual basis. The issue is impossible for the Court to review.

## II. Admissibility of Clean-up Statement

[9, 10] Appellant claims the substance of the clean-up statement should not have been used against him because it was obtained with a promise that he would not be charged with the burglaries he "cleaned-up." He acknowledges that even a statement which is not admissible as substantive evidence may nonetheless be used for impeachment, provided the trustworthiness of the evidence satisfies appropriate standards. *Harris v. New York*, 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971); *Mills v. State* (1986), Ind., 498 N.E.2d 1236. He claims the statement was given after he was promised immunity from the prosecution on the burglaries he "cleaned-up," and allegedly without the benefit of a waiver of his *Miranda* rights.

Van Cleave initially mentioned the twenty-five burglaries during a confession to the burglary for which he was eventually convicted. Before making that confession, Van Cleave signed a waiver of rights. In the confession itself he stated again that he was aware of his rights, that he had read and understood them, and that no force, threats, or promises had been made by the police in order to take the statement. After confessing to that burglary, he was asked, "Have you been involved in any other burglaries on the west side?" He then admitted twenty to twenty-five burglaries.

A few days later, the actual clean-up statement was taken after appellant drove through west-side neighborhoods with the police and showed them some of the homes he had burglarized. It was at this time he was told he would not be charged with the other crimes. After Van Cleave was impeached with the substance of his clean-up statement, his attorney asked him on re-di-

rect if he had been informed the statement would never be used against him. Appellant responded, no, he had only been told he would not be charged with the burglaries.

Although appellant's statement would not have been admissible against him on the issue of his guilt in the listed burglaries had that issue been litigated, it was shown nonetheless to have been the product of a rational and free will. As such, it was properly used for impeachment after appellant stated he had told the court about "all the crimes" in which he had been involved. "The shield provided by *Miranda* cannot be perverted into a license to use perjury by way of a defense, free from the risk of confrontation with prior inconsistent utterances." *Harris*, 401 U.S. at 226, 91 S.Ct. at 646, 28 L.Ed.2d at 5.

## III. Improper Impeachment

On cross-examination, the prosecutor asked: "In your examination by Mr. Hawkins, did you tell us about all the crimes that you have committed?" Van Cleave answered, "Yes." Appellant was questioned about his history with guns. He said that between the summer of 1980 and October 1982 he had two or three different types of guns in his possession, one of which was a shotgun. He testified he bought those guns on the street. In response to Van Cleave's assertion that he had told the court everything about his criminal history and that he had possessed only one shotgun during his life, prosecutor Goldsmith began to question Van Cleave about his possession of guns.

Q. Now, I want to pause just for a second now and think about whether you forgot to tell us about any other guns—shotguns, revolvers, cannon [sic], machine guns—whatever. Any type of gun.

A. Mostly hand guns.

Q. So two or three is the extent of it, right?

A. It was more than two or three.

Q. Okay. How many?

A. I can't say for sure.

Q. More than fifty?

A. No.

Q. More than ten?

A. No.

Q. So somewhere between—more than six?

A. Somewhere between, maybe five and ten.

Q. Five and ten. It wasn't between two or three it was between five and ten?

A. Right.

Q. Okay. How many of these five or ten were shotguns?

A. Just the one.

Q. Just the one shotgun?

A. Right.

Q. Where did you buy that one shotgun?

A. From this guy on the Avenue.

Q. What year was that approximately?

A. Eighty-one.

Q. Eighty-one. And you're telling this Judge under oath, on trial for your life, that's the only shotgun you've had?

A. That's right.

Q. How many stolen guns have you had in your possession?

A. Well, I imagine all of those were stolen that I bought.

Q. Isn't it a fact that you committed burglaries in particular for the purpose of stealing guns?

A. No.

Q. Isn't it a fact that on October 2, 1980, at 1305 Fall Creek, you stole a handgun in a burglary?

A. No.

Q. Isn't it a fact that on November 28, 1980, you stole a gun in a burglary at 1440 North Lynn, Indianapolis, Indiana?

A. No.

Q. Isn't it a fact that on November 21, 1980, you stole a revolver at 556 Ransom in a burglary?

A. No.

Q. Isn't it a fact that on October 14, 1980, at 2813 Mussman you stole a shotgun in a burglary?

A. No.

Q. Isn't it a fact that you stole two guns at 7 Edwin Court on October 7, 1980, in a burglary?

A. No.

Q. Isn't it a fact that you stole two guns, one of which was a shotgun, on March 6, 1981 at 4126 Kalmar, Indianapolis, Indiana?

A. No.

Q. None of those things are true?

A. Not no guns.

Q. Isn't it a—did you commit all those burglaries?

A. Yes, and I signed a clean-up statement to those.

Q. And didn't you say at the time you signed that clean-up statement that you committed those burglaries for the purposes of finding color t.v.'s, guns and coins?

A. I didn't say guns. I said color t.v.'s and money.

Q. Didn't say guns? You're sure?

A. I'm not sure. Not to my recollection.

Q. You're not sure, not to your recollection?

A. That I stated for gun—for guns.

Q. You're telling this court now, today, that you didn't commit those burglaries for purposes of stealing guns as well as color t.v.'s—

A. —not just for those purposes, no.

Q. Did you steal guns at those places on those dates?

A. The ones I done I was not by myself. I, myself, did not get no guns.

Q. Did you understand the question?

A. Did I get any guns?

Q. Were guns stolen during those burglaries on those dates?

A. Not that I know of.

Q. In fact, in early 1981 you committed 25 burglaries on the west side of Indianapolis, did you not?

A. Yes.

Q. And do you remember just like twenty minutes ago when I said, "Please look at the Judge and tell her whether you told us about the extent of your criminal history." Do you recollect that?

A. Yes.

Q. And did you say, "I told her truthfully. I told everything truthfully." Do you remember that?

A. Well, I was answering basically to what you were saying, to what I comprehended from that.

Q. In fact, when you answered Mr. Hawkins' questions and my questions, you omitted telling this Judge about 25 burglaries on the west side, isn't that right?

A. Not only on the west side—

(Counsel object to tenor of questions)

Q. Isn't it a fact that you told the Judge about crimes you'd committed that you thought we knew about?

A. Pardon me?

Q. Never mind. How many of the 25 burglaries did you get guns?

A. I myself got none.

Q. How many of the 25 burglaries were guns taken?

A. I don't know.

Q. Isn't it true that in at least two of the burglaries that you were involved in shotguns were taken?

A. How many of the burglaries?

Q. At least two.

A. No.

Appellant argues the prosecutor used improper impeachment. He claims the prosecutor should have followed the accepted procedure for impeachment by prior inconsistent statements by asking, "Did you on March 28, 1981, admit to Detective James Fisher, that you had committed twenty to twenty-five burglaries?" Appellant argues that his answer "Yes" would have completed the impeachment and the State could not have properly elicited details of the burglaries. He claims the detailed questions about burglary in search of guns cannot be justified as impeachment by prior inconsist-ent statements because, he states, no prior statement referred to guns. He claims this examination in depth about the burglaries was akin to the cross-examination condemned in *United States v. Dow*, 457 F.2d 246 (7th Cir.1972). Dow took the stand and was impeached by proof of prior felonies. There, prejudicial and reversible error occurred where the prosecutor was allowed to dwell on the details of the prior crimes.

Van Cleave was impeached about past crimes and past possession of guns through information from two sources: the documents pertaining to the clean-up statement and the police reports from the listed burglaries. First, he made a prior statement to police in the clean-up statement. According to the interdepartmental memorandum, he said he committed burglaries for the purpose of stealing guns and other items. Thus, when he failed to mention the burglaries in his direct testimony and asserted that he had possessed fewer than ten guns and only one shotgun, his *prior statements* were available for impeachment. It is true the State did not use a textbook approach by first phrasing its questions to remind appellant of the time and circumstances of his statement. *See Gradison v. State* (1973), 260 Ind. 688, 300 N.E.2d 67. Nevertheless, it is plain appellant was not harmed by the style of the interrogation. The clean-up statement came to his mind immediately, he acknowledged it, and remembered the circumstances.

Second, in preparation for the hearing, it appears prosecutor Goldsmith used case reports of the earlier burglaries to substantiate that guns, including shotguns, were indeed stolen. Therefore, Van Cleave was impeached with independent fact, not just his prior statement. Because the State was not impeaching appellant solely from his prior statement, it was not required to "take its answer" and end the impeachment when appellant acknowledged making it. Van Cleave continued to deny the burglaries were committed in search of guns. Unlike the situation in *Dow*, the impeachment was not yet complete.

Appellant claims the prosecutor's interrogation did not correctly describe the clean-up statement. He argues that he was sentenced on material misinformation. Appellant has not specified how this is so, and a review of the record and the clean-up statement belies his allegation.

### IV. Error in Discovery Order

■ Appellant filed a special motion for discovery in which he requested information on all murder charges filed in Indiana since October 1977, the effective date of the current death penalty statute. Van Cleave stated he needed the information to substantiate his allegation that Indiana's death penalty statute is not standard and uniform in its application and that it had been unconstitutionally applied against him. After a hearing, the court ordered the State "to provide any files on any cases in Marion County since 1979 in which the death penalty is involved and ... to provide case names and numbers, if available, as to any Murder charges since 1979."

The State sought relief from the order on the grounds that it was oppressive. It indicated that it had a list of approximately 200 homicide cases since January 1979, but that, because of computer limitations, it was not a complete list. The State contended that a manual search of Indianapolis Police Department files would provide the requested information, but that it would require great expense and many hours of labor. The State claimed the information was not relevant and that only information on other death penalty cases was pertinent. Thus, it requested an amended order limiting discovery to those cases since January 1979 in which the death penalty charge had been filed.

The court amended its order to include only "provision of all records pertaining to all cases in which the death sentence was requested in Marion County since June 1, 1979." Subsequently, the State provided all police homicide reports for the six months preceding the discovery order and the charging informations and reports for 9 homicides since 1979 in which, apparently, the death penalty was filed. Van Cleave

did not file any objection to the court's amended discovery order, but raised the error in his motion to correct error and in his brief, alleging the final order prevented him from demonstrating that the death penalty is routinely applied in Marion County only against blacks charged with killing whites.

The trial court has broad discretion in discovery matters and has the inherent power to guide and control proceedings. *Spears v. State* (1980), 272 Ind. 634, 401 N.E.2d 331. Absent clear error, this Court will not overturn the trial court's discovery ruling. *Wagner v. State* (1985), Ind., 474 N.E.2d 476.

The State made a detailed showing of the burden it would have endured under the court's original discovery order. It contended that the data from the death penalty cases alone would suffice to prove or disprove appellant's allegation that the death penalty was sought disproportionately against blacks who kill whites. Indeed, after appellant was provided with the information under the amended order, no motion to dismiss the death sentence information was filed on the basis of racial discrimination.

Van Cleave has not convincingly shown that the court erred. The amended order reasonably afforded him an opportunity to substantiate his allegations. If there was some substantial basis for his claim, the information provided should have formed a foundation from which evidence could have been presented to the trial court. He was not deprived of the opportunity to litigate the issue fully, as he claims, citing the only case relied upon for his argument, *Gasaway v. State* (1967), 249 Ind. 241, 231 N.E.2d 513, which is completely inapposite.

### V. Interference with Discovery

■ Appellant alleges prosecutorial misconduct through State interference with his attorney's attempts to interview State's witness Schwarz and with his attempt to have appellant take a polygraph in jail. Neither allegation was made in the motion to correct error.

Appellant's counsel asked Schwarz, "Were you contacted by a private investigator representing himself as working for me on this case ...?" Schwarz said he had been contacted and arranged a meeting but later called the investigator and "told him that he should call the prosecutor's office and that they would meet us there for that meeting, and he didn't call me back." Schwarz said that, for his own convenience, he did not want to meet with the investigator without someone from the prosecutor's office because he knew he would have to repeat to them everything he told Van Cleave's investigator. The investigator testified that the deputy prosecutor told him he would be allowed to talk to Schwarz but that the deputy prosecutor would have to be present during the interview and that he would not allow the investigator to take Schwarz to the scene of the crime.

A witness from a polygraph agency testified that his examiner had arranged to conduct the examination but was told that the deputy prosecutor had "nixed" the test. It appears from the record that on the day of the scheduled exam, however, appellant was in "administrative lock-up" following the jail disturbance.

Van Cleave asserts he was prejudiced because his investigator was not permitted to ascertain Schwarz's exact location when he witnessed the shooting and because the polygraph might have revealed the clean-up statement and the details of the shooting. Because of appellant's failure to seek the trial court's assistance on these problems, this Court may conclude that counsel's preparation and investigation were in fact not hindered. *See Dillard v. State* (1971), 257 Ind. 282, 274 N.E.2d 387 (defendant must call trial court's attention to prosecution's non-compliance with discovery order). Furthermore, Schwarz's exact location was not a point of much contention or overall import. It has already been established that counsel's ignorance about the clean-up statement did not substantially affect the proceedings. Finally, several witnesses testified about the shooting and it not clear what more might have been revealed by a polygraph examination.

Van Cleave's assertions of prejudice do not suffice to overcome the waiver doctrine or to bring the case within the purview of the many he cites in which misconduct and prejudice were clearly shown. *See, e.g., Pyle v. Kansas,* 317 U.S. 213, 63 S.Ct. 177, 87 L.Ed.2d 214 (1942) (prosecutor's knowing use of perjured testimony and suppression of exculpatory evidence required reversal).

## VI. Effective Assistance of Counsel

■ Appellant claims his trial counsel did not effectively represent him. Our scrutiny of counsel's performance is highly deferential. Appellant must show, first, that counsel's performance was deficient and, second, that the defense was prejudiced by the deficient performance. *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *Price v. State* (1985), Ind., 482 N.E.2d 719.

Van Cleave's specific claim of ineffectiveness centers on counsel's failure to learn independently of the clean-up statement.

■ Counsel testified during the hearing on the motion to correct error about his extensive conversations with Van Cleave concerning his criminal history and past use of firearms. Counsel's failure to ask his client "Did you ever give a clean-up statement?" does not take his conduct outside the range of professional norms. Furthermore, we hesitate to fault him for failing to discover the statement in light of the hindrance imposed by his client's lack of candor and by the State's discovery violation.

Moreover, counsel's failure to discover that his client's former burglary confession contained the clean-up information does not support the prejudice requirement of the *Strickland* test, which requires appellant to show a reasonable probability that the result of the proceedings would have been different had counsel not erred. We have already stated our opinion that the revelation about the clean-up statement, however startling to counsel, did not alter the outcome nor would its timely discovery have significantly changed Van Cleave's strategy.

■ When the impeachment concerning Van Cleave's burglaries occurred, counsel did not make appropriate objections. Generally, failure to object and request a continuance or exclusion of the evidence is grounds for waiver of a discovery error. *Murphy v. State* (1976), 265 Ind. 116, 352 N.E.2d 479.

■ Appellant was not prejudiced by counsel's failure to object. Nothing in the record indicates a continuance would have been helpful for purposes of developing rebuttal or objection to the evidence, because the clean-up statement did indeed exist by Van Cleave's own admission and it was admissible against him.

■ Van Cleave also asserts that counsel was ineffective for failing to determine whether Van Cleave pled guilty in jail to attempted escape or to possession of contraband. Counsel apparently relied upon a misunderstanding shared by Van Cleave and his mother about the outcome of the jail proceedings instead of exploring the jail records independently. While this may have been inadequate investigation in preparation for the hearing and obviously cannot be said to be a strategic decision to which this Court would pay deference, this isolated error does not necessarily amount to ineffective representation.

Even if counsel's failure to ascertain the facts about Van Cleave's administrative conviction could be said to constitute deficient performance, it does not appear to have had much impact on the outcome. He and his mother were allowed to testify as to their understanding of his conviction. Whether it was possession or attempted escape to which Van Cleave pled guilty, the court was presented with the incriminating details of the jail disturbance and could draw its own conclusion about appellant's culpability. Also, appellant's presentence report refers to attempted escapes from jail.

Other than the isolated errors mentioned above, counsel's preparation for the hearing was careful and complete. Counsel was generally effective at examination and was zealous and reasonable in his representation. Appellant has not proven his claim of ineffective representation.

## VII. Constitutionality of Death Penalty

■ *Unlawful Discrimination.* Appellant claims the prosecutor's office of Marion County has established a pattern of conduct which demonstrates an invidious discriminatory practice against blacks. He did not raise this issue directly in his motion to correct error, but only as part of the allegation that the court erred in amending its original discovery order. He has not provided case law or legal standards to review his claim. Despite the fact that discovery provided him with the information pertaining to all death penalty cases filed by the present prosecutor, he has failed to substantiate his claim with facts. Purposeful discrimination may not be assumed or merely asserted. *McCleskey v. Kemp*, 481 U.S. ——, 107 S.Ct. 1756, 95 L.Ed.2d 262 (1987) (defendant has the burden of proving purposeful discrimination).

*Proportionality Review.* Van Cleave argues that Indiana's death penalty statute, Ind.Code § 35–50–2–9 (Burns 1984 Supp.), is unconstitutional because, he claims, it does not provide for a proportionality review of appellant's sentence through comparison of his crime and penalty to those of others. He lists in his brief 86 felony murder cases in Indiana, none of which resulted in a death sentence. He claims there is no realistic difference between his case and these, apart from the sentence imposed.

The State claims in its brief that 38 of these offenses occurred before the death penalty was reinstated in Indiana, that 7 did not involve killing at all, that one is an appeal from a shoplifting conviction, and so on. Neither party provides any sworn testimony or certified records about these cases. Declaring a statute unconstitutional on such a non-record is unimaginable.

■ Moreover, it is altogether likely, and constitutionally so, that in some of the cases which might have qualified as capital offenses, the prosecutor chose not to request the death penalty because of mitigat-

ing factors. The discretion to refrain from asking for execution is not generally regarded as violating the U.S. Constitution. *Gregg v. Georgia,* 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976); *Williams v. State* (1982), Ind., 430 N.E.2d 759.

▇▇▇▇▇ The Eighth Amendment does not require that Van Cleave's case be subjected to detailed comparison with those of others. *Pulley v. Harris,* 465 U.S. 37, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984); *Burris v. State* (1984), Ind., 465 N.E.2d 171. Indiana's death penalty statute, with its requirement that the trial court weigh factors in mitigation and enter a specific record of its reasoning, automatically reviewed by this Court, is sufficiently tailored to ensure the death penalty is not arbitrarily or disproportionately imposed. *Brewer v. State* (1981), 275 Ind. 338, 417 N.E.2d 889, *cert. denied,* 458 U.S. 1122, 102 S.Ct. 3510, 73 L.Ed.2d 1384 (1982); *Schiro v. State* (1983), Ind., 451 N.E.2d 1047, *cert. denied,* 464 U.S. 1003, 104 S.Ct. 510, 78 L.Ed.2d 699.

### VIII. Appropriateness of Sentence

▇▇▇▇▇ This Court must review the imposition of the death sentence against appellant to determine whether the penalty is appropriate to this offender and his crime. Van Cleave claims this Court routinely accepts the findings of trial courts in death sentence appeals. His lawyer claims this Court's affirmance of the sentence will "reveal a cynical result-oriented desire to approve *pro forma* the findings of the trial court." Only those who have never borne the weight of the responsibility for these decisions can feel free to level such charges.

Appellant urges the Court to reverse the trial court's imposition of the death sentence and hold that the record does not support its finding that the aggravating circumstances were proven beyond a reasonable doubt.

While another trial court might have believed appellant's version that the killing was unintentional, it was for this trial court to weigh the evidence and judge the credibility of the witnesses. *Burris,* 465 N.E.2d

at 193. This Court will not engage in *de novo* review. Rather, it looks to the evidence most favorable to the trial court's judgment together with all reasonable inferences to determine whether the State proved the alleged aggravating factor beyond a reasonable doubt.

*Intentional Killing.* The evidence supporting the court's conclusion that the State's alleged aggravating factor was proven beyond a reasonable doubt. Van Cleave was shown to have a familiarity with guns and, in fact, had threatened to use one against James Buchanan. Despite his claim that he was three to five feet from Falkner and jerked back causing the gun to discharge when Falkner moved towards him, State's evidence was that he was six to eight feet away from Falkner, who made no move toward his assailants. Van Cleave claims to remember neither cocking the gun nor loading it, but the court heard testimony that he had shells with him and had broken the gun open earlier that night. Appellant approached Falkner with his finger on the trigger. That night, after the shooting, he said he shot Falkner for his stubbornness about giving up his property. Although the evidence was in conflict, that the shooting was intentional was proven beyond a reasonable doubt.

Likewise, the evidence most favorable to the judgment shows that the aggravating factor presented to the court outweighed the mitigating factors. With or without the multiple burglaries in evidence, the record shows Van Cleave's criminal history, summarized elsewhere in this opinion, is hardly insignificant. It demonstrated a pattern of disregard for punishment and a lack of any interest in conforming to society's legal norms. There was not any evidence of extreme mental or emotional disturbance, nor did the victim consent or participate. Appellant's role in the killing was not relatively minor, as he pulled the trigger, nor was he under another's domination. Although Van Cleave was intoxicated, he was, as the court stated, able to plan the crime, sneak up on Falkner, and run away.

*Mitigating Factors.* As for mitigating factors beyond those listed specifically in Ind.Code § 35–50–2–9, the court considered only appellant's home life which deteriorated in his early teens, his failed stint in the army from which he was honorably discharged, and the fact that thereafter he could not find a job. The court then concluded that the aggravating factor did outweigh the mitigating factors. Van Cleave's relatively young age (20) at the time of the offense is a possible mitigating factor, but he did not argue it before the trial judge or on appeal. We think the trial judge has correctly assessed the relative weight of these circumstances and thus concur in her conclusion that the State was entitled to the penalty it sought.

The judgment of the trial court is affirmed.

DeBRULER, GIVAN, PIVARNIK and DICKSON, concur.